2017 UT App 47

# THE UTAH COURT OF APPEALS

GARTH GINES,
Appellant,

*v.*

SEAN EDWARDS,
Appellee.

Opinion
No. 20150259-CA
Filed March 16, 2017

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 120400620

Leonard E. McGee and Peter R. Mifflin, Attorneys
for Appellant

Karra J. Porter, Attorney for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1     Garth Gines appeals from the jury's verdict in a case
involving an automobile accident and a claim of negligence
against Sean Edwards, the driver of the vehicle that collided
with the vehicle in which Gines was a passenger. Gines also
appeals certain of the trial court's decisions related to Edwards'
expert witness. We affirm.

## BACKGROUND

¶2     In early December 2009, Gines was a passenger in a
vehicle that was rear-ended by a vehicle driven by Edwards. At
trial, Edwards testified that his vehicle had been moving at

approximately five to ten miles per hour when the accident occurred.

¶3     Gines had a preexisting spinal condition. Before the accident, Gines had undergone spinal surgery twice—once in 2005 and once in 2007—to relieve headaches and pain in his neck. Although the surgeries had temporarily relieved the pain, his symptoms returned. About six weeks before the accident, one of Gines' treating physicians recommended further surgery, opining that Gines' spinal "condition [was] not static" and was expected to "get worse." The doctor stated that, although the effect of surgery was "unpredictable," it was "[the] best chance of improvement at this time." He noted that "all conservative measures and surgery twice" had failed, and that Gines was "truly disabled from any regular work."

¶4     After the accident, Gines' treating physician described him as having "neck and upper back pains, some acute and some chronic," and an MRI showed "a slight progression of the central canal narrowing" at the two spinal levels below the level that had previously been surgically fused. When Gines' pain did not abate, he had a third surgery in June 2011 to fuse the two lower levels of his spine where his treating physician had noted "degenerative progression." Gines' pain persisted, however, and five months after the surgery, Gines was still experiencing significant pain and taking narcotic pain relievers.

¶5     In April 2012, Gines filed a complaint alleging that, "[a]s a direct and proximate result of [Edwards'] negligent actions," he had "sustained serious injuries" in the automobile accident. He requested "past, present, and future" general and special damages.

¶6     Before trial, Gines filed two motions relevant to this appeal. The first was a February 2014 motion in limine requesting, among other things, that the trial court exclude one of Edwards' designated expert witnesses, Dr. Goldman, from testifying at trial. Gines asserted that Edwards had failed to

provide Dr. Goldman's expert report by the deadline then in effect. In response, Edwards provided an expert report from Dr. Goldman and argued that the court should not exclude him as a witness. At an April 2014 hearing, before the October 2014 trial had been scheduled, the trial court found that the "failure to provide . . . [Dr. Goldman's] report was harmless" and ruled that Dr. Goldman would not be "excluded from providing testimony at trial."

¶7     Second, after receiving Dr. Goldman's report, Gines filed a motion for partial summary judgment. He contended that, based on the "[a]reas where Dr. Goldman['s] opinion [is] favorable to [Gines]," he was entitled to judgment as a matter of law regarding fault, causation of his injuries, the reasonable necessity of his postaccident medical treatment, and his need for future medical care. The trial court agreed that there was no question of material fact "on the issue of the negligence of [Edwards]" and "the amount of [Gines'] past medical bills," which the court determined were $61,296.60 (the past medical expenses). However, the court concluded that there was a dispute of material fact regarding the reasonableness and necessity of Gines' medical expenses—that is, whether the past medical expenses and any future medical expenses that Gines claimed were in whole or in part caused by the accident rather than by his preexisting spinal condition. The court explained that, while "it is undisputed that [Gines] suffered at least a musculoskeletal injury to the cervical spine, of the sprain/strain variety with a temporary aggravation and superimposition upon a previously injured and altered symptomatic cervical spine anatomy" as a result of the accident, there was a factual dispute regarding "[w]hether [Gines] suffered more serious injury." Thus, the case proceeded to trial to resolve the question of causation and the amount of damages, including past and future medical expenses and noneconomic damages.

¶8     At trial, Gines argued that all of the past medical expenses were caused by the accident and that future medical expenses

stemming from the accident would be incurred as well. Edwards countered that "entirely 100 percent [of Gines' condition is] due to his previous injuries and ongoing degenerative condition," and that the accident only caused "a temporary aggravation of a preexisting degenerative condition." He agreed that Gines had needed the surgery and other treatment for which he incurred the medical bills, but argued that the accident "could not have injured" Gines, based on the extent of Gines' preexisting spinal condition. Accordingly, he asked the jury to award "much, much less" than the $61,296.60 Gines claimed for past medical expenses and nothing for future medical costs.

¶9    Dr. Goldman was the defense's sole medical expert witness. Prior to Dr. Goldman's taking the stand, Gines raised a question about the permissible scope of his testimony. The trial court conducted a hearing outside the presence of the jury to consider the objection. Gines argued that Dr. Goldman's expert report did not fairly disclose three issues related to apportionment of damages. First, he asserted that Dr. Goldman's report did not disclose "apportionment between what injuries were caused by the accident and what injuries were attributable to [his] preexisting pathology." Second, he claimed that the permanent impairment rating in Dr. Goldman's report did not provide a nonarbitrary basis for apportioning which injuries were caused by the accident and which were preexisting—i.e., a percentage rating both of his "whole person impairment" due to his entire "cervical spine dysfunction" and the percentage of that "whole person impairment" attributable to the accident. Gines argued that the impairment percentages included in Dr. Goldman's report were arbitrary because they were stated "as a hypothetical" and without "fully commit[ting] to it," and that even if those percentages were disclosed, they did not provide a reasonable basis for apportioning the damages under the apportionment standard set forth in *Harris v. ShopKo Stores, Inc.*, 2013 UT 34, 308 P.3d 449. Third, Gines asserted that Dr. Goldman's report did not disclose "what medical expenses were incurred as a result of the accident and what medical expenses

were due to [Gines'] preexisting condition." Of the three, Gines indicated that he had "the greatest objection" to the issue of medical expenses, because he did not know from Dr. Goldman's report "what numbers [Dr. Goldman was] going to throw out there as far as what medical expenses are related and which ones aren't."

¶10   As to Gines' first and second objections, Edwards countered that Gines had suffered only "a temporary aggravation of a preexisting degenerative condition" from the accident, not any permanent injury. Thus, he argued, "apportionment really isn't necessary" where "100 percent of what [Gines] is feeling right now" was due to his preexisting condition. He also pointed out that, even though Dr. Goldman's report included impairment ratings, those percentages had been stated only hypothetically because Dr. Goldman ultimately "ha[d] committed to the position that [the effect of the accident was] temporary" and there was no permanent impairment for which a rating could be assigned. With respect to the medical expenses, Edwards asserted that, although Dr. Goldman did not "put numbers to" the costs of treatment, he did describe in his report the treatment he considered appropriate for the sort of temporary injury he believed Gines had suffered in the accident. Edwards contended that any failure to include the costs of the treatment was "harmless" and "would [not] be [a] surprise to the plaintiffs because they deal with this every day in every case that they have" and "they know what physical therapy . . . [and] chiropractic [treatment] cost[]."

¶11   Dr. Goldman then told the court that he believed Gines had suffered only a "temporary exacerbation of a preexisting injury" which would have required only diagnostic tests, such as x-rays and an MRI; physical therapy; medication; and home exercises. He stated that a physical therapist typically charges, on average, "$125 . . . per session" and that, including the diagnostic tests and some medication, he estimated that the total cost for the temporary injury incurred in the accident would be

"somewhere in the range of 7, 8, maybe $10,000 at most for the whole diagnosis and treatment."

¶12    The trial court granted in part and denied in part Gines' motion. The court stated that it agreed "with defense counsel that apportionment is not an issue," where "defendant's position [is] that no part of Mr. Gines' condition today is attributable to the accident." The court also decided that "adequate foundation has been laid for Dr. Goldman to testify about apportionment. Zero percent if we are talking about a temporary aggravation and 20 percent" for permanent. Additionally, the court permitted Dr. Goldman to testify "that a healthy person who suffered a temporary sprain/strain of the cervical spine would incur diagnostic costs and receive treatment consisting of physical therapy, medication, and home exercises," as those issues were "fairly disclosed in his report." However, the court excluded any testimony "as to what treatment would have been reasonable and necessary for a person with Mr. Gines' altered anatomy" as "[t]here is just nothing in the report that goes to that issue." Finally, the court found "the failure to disclose the progression rate generally charged by physical therapists" was harmless, where counsel for both parties were "experienced attorneys," and this information "is generally known to them." The court accordingly allowed Dr. Goldman to testify about the costs of treatment for a healthy person who had experienced the kind of temporary injury Dr. Goldman believed Gines had suffered from the accident.

¶13    When called to the stand at the jury trial, Dr. Goldman testified that Gines had suffered only a temporary "sprain/strain injury" from the accident; that normal treatment would have required physical therapy, medication, and a "home exercise program"; and that, including physical therapy and diagnostic costs such as x-rays or an MRI, the entire treatment he had described would cost approximately seven to ten thousand dollars. Edwards' counsel complied with the court's order not to elicit testimony about the course of treatment for a person with

Gines' altered anatomy, but Gines' counsel raised the issue during cross examination, and Edwards' counsel followed up on redirect. Dr. Goldman testified that the course of treatment for someone with altered spinal anatomy, such as Gines, would be similar as for a person with normal anatomy and that the treatment would cost essentially the same. Dr. Goldman was not asked and provided no opinion regarding a permanent impairment rating for Gines; the issue was not raised on direct or cross examination.

¶14    The jury awarded Gines $10,000 in past medical expenses, nothing for future medical expenses, and $7,500 for noneconomic damages (i.e., pain and suffering). Gines then moved for a directed verdict, judgment notwithstanding the verdict, or, in the alternative, a new trial. Gines contended that "Dr. Goldman was unfairly allowed to testify outside the scope of his report" and that he was "entitled to a directed verdict on the issue of special damages"—essentially the full amount of the past medical expenses—"because [Edwards] failed to provide the jury with a non-arbitrary basis for apportioning damages." The trial court denied Gines' motion, and Gines appeals.

ISSUES AND STANDARDS OF REVIEW

¶15    Gines argues that the trial court erred when it allowed Edwards' expert witness, Dr. Goldman, to testify at trial after the defense failed to provide his expert report before the deadline. Gines further contends that, even if Dr. Goldman was allowed to testify, the court should not have permitted him to specifically testify about cost of the treatment for a person without altered cervical anatomy when those opinions were not disclosed in his expert report. "A trial court's decisions about the admissibility of expert testimony are reviewed for abuse of discretion." *Johnson v. Montoya*, 2013 UT App 199, ¶ 6, 308 P.3d 566.

¶16    Gines also argues that the trial court erred when it denied his motion for directed verdict, judgment notwithstanding the

verdict, or a new trial, because Edwards' evidence regarding apportionment of injury and costs of the harm caused by the accident was too speculative to support the jury's verdict. We review a trial court's ruling on a motion for a directed verdict and a judgment notwithstanding the verdict for correctness. *Blackmore v. L & D Dev. Inc.*, 2016 UT App 198, ¶ 24, 382 P.3d 655; *State v. Bossert*, 2015 UT App 275, ¶ 12, 362 P.3d 1258. We review a trial court's decision whether to grant a new trial for abuse of discretion. *Bossert*, 2015 UT App 275, ¶ 13. We will uphold a jury's decision as to damages "so long as there is competent evidence to sustain it." *Cornia v. Wilcox*, 898 P.2d 1379, 1386 (Utah 1995).[1]

## ANALYSIS

### I. The Trial Court Did Not Abuse Its Discretion by Admitting Dr. Goldman's Report.

¶17    Gines argues that the trial court abused its discretion when it refused to exclude Dr. Goldman's expert report. The trial court found that Dr. Goldman's report had not been timely provided to Gines but concluded that the late disclosure was harmless. Gines contends that the court's conclusion "is without reasonable basis." Gines explains that, because he "did not know the several material opinions Dr. Goldman was going to offer at

---

1. Gines identified two additional issues in his opening brief which we do not further address. First, Gines raised the issue of "whether the Court erred when it instructed the jury on apportionment," but he did not analyze it in his opening brief. Second, Gines contended that Dr. Goldman's apportionment of Gines' rating for permanent whole body impairment between the accident and the preexisting condition was arbitrary. However, while Dr. Goldman included such an opinion in his written report, he did not offer an opinion about it at trial. We therefore do not address either issue.

trial," he was prevented from "designat[ing] a rebuttal expert during expert discovery"; consequently, Edwards, not Gines, was left "with the last word" at trial. Edwards responds that Gines has not met his burden of showing that the trial court abused its discretion because he failed to provide the transcript of the hearing in which the trial court articulated its reasons for finding that the nondisclosure was harmless. He argues that it is "impossible" for this court to "know what was presented to the trial court, what the court found, or why the court exercised its discretion as it did," and therefore it is "impossible to say that the trial court abused that discretion." We agree with Edwards.

¶18 Generally, "[w]hen a defendant predicates error to [an appellate court], he has the duty and responsibility of supporting such allegation by an adequate record. Absent that record, defendant's assignment of error stands as a unilateral allegation which the review[ing] court has no power to determine." *See State v. Linden*, 761 P.2d 1386, 1388 (Utah 1988) (per curiam) (citation and internal quotation marks omitted). As a consequence, "when an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below." *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278.

¶19 The importance of this requirement is particularly apparent here. In its written ruling allowing the late disclosure of Dr. Goldman's expert report and permitting him to testify at trial, the trial court expressly stated that "[t]he basis for the Court's ruling is set out in greater detail in the record of the hearing of April 28, 2014." The ruling itself provided no analysis of the circumstances before the court or the reasoning supporting its finding of harmlessness. Instead, the ruling simply states that the nondisclosure was harmless—"[f]or the reasons set forth in the record of the April 28, 2014 hearing"— and ruled that Dr. Goldman would be permitted to testify.

¶20 Nonetheless, Gines argues that the failure to provide a transcript of that hearing "should not automatically be dispositive in whether or not the court can review the

underlying decision," because this court was otherwise provided "the entire record of the trial and more than 2,000 pages of record materials." In essence, he contends that the failure to provide the hearing transcript is harmless because appellate courts can review trial court decisions where there was no hearing held on the matter by simply referring to other materials provided in the record.

¶21 But it is the appellant's burden to assemble, transmit, and perfect the record on appeal. *See* Utah R. App. P. 11(c), (e); *see also State v. Wetzel*, 868 P.2d 64, 67 (Utah 1993) ("Parties claiming error below and seeking appellate review have the duty and responsibility to support their allegations with an adequate record."). While an appellant is not required to provide the transcript from every proceeding that occurred in a case, *see* Utah R. App. P. 11(e)(1), the appellant *is* required to "include in the record a transcript of all evidence relevant to [a] finding or conclusion" that is being challenged on appeal, *see id.* R. 11(e)(2) ("Neither the court nor the appellee is obligated to correct appellant's deficiencies in providing the relevant portions of the transcript."). In this case, Gines is challenging the trial court's decision permitting Dr. Goldman to testify and the finding of harmlessness underlying that decision. The trial court held a hearing relevant to those issues where it articulated "the basis" for that decision—which was incorporated by reference into the court's summary written decision—and Gines has not provided the transcript of that hearing. It is well established that in the absence of a transcript of a crucial proceeding, we will presume that a trial court's decision is reasonable, supported by the evidence, and did not constitute an abuse of discretion.[2] *See Linden*, 761 P.2d at 1388 (per curiam).

---

2. We note that the trial court allowed Dr. Goldman to testify despite the late disclosure of his report in an April 2014 motion hearing that took place before the October 2014 trial was even

(continued…)

¶22    Accordingly, we affirm the trial court's decision to permit Dr. Goldman to testify at trial.

## II. The Trial Court Did Not Abuse Its Discretion When It Permitted Dr. Goldman to Testify Regarding the Costs of Reasonable and Necessary Treatment for a Person Without Gines' Preexisting Condition.

¶23    Gines next argues that the trial court abused its discretion when, at trial, it permitted Dr. Goldman "to testify outside the contents of his [expert] report." In particular, he asserts that rule 26 of the Utah Rules of Civil Procedure required the trial court to exclude Dr. Goldman's testimony regarding certain "key opinions necessary to support the defendant's affirmative defenses," including that "Gines suffered a mere temporary sprain/strain" and what constituted "reasonable and necessary treatment . . . for a person"—unlike Gines—"without altered cervical anatomy." He contends that the trial court abused its discretion when it permitted Dr. Goldman to testify that "reasonable and necessary medical treatment for a normal person [with a musculoskeletal strain similar to Gines'] would amount to approximately $10,000."[3] Gines contends that this figure "was not contained in [Dr. Goldman's] report" and that "[i]t was a complete and total surprise" that "hurt [his] ability to rebut Dr. Goldman's opinions and is directly reflected in the

_____

(…continued)

scheduled and six months before the trial occurred. Thus, Gines' argument that the court's decision prevented him from adequately responding to the opinions described in Dr. Goldman's report is not facially compelling.

3. Gines has not challenged the scope of Dr. Goldman's testimony under any rule of evidence. Rather, he argues this alleged error as a violation of the discovery rules in the Utah Rules of Civil Procedure. We limit our discussion accordingly.

jury's award." We conclude that Gines has not adequately engaged with the bases of the trial court's determinations, and we are therefore unpersuaded by his arguments.

¶24 During the trial, and outside the presence of the jury, the court heard arguments from both parties regarding the scope of Dr. Goldman's testimony and, in particular, the cost of treatment issue. As discussed above, Gines argued that Dr. Goldman should not be permitted to testify regarding apportionment between the injuries attributable to the accident and those attributable to Gines' preexisting condition, any permanent impairment rating, and the costs of medical treatment necessary to treat Gines' existing medical condition versus those required to treat the injuries caused by the accident.

¶25 In response, Edwards argued that Dr. Goldman would testify that apportionment was not at issue—the accident had a temporary effect and did not contribute to the spinal condition for which Gines sought compensation at trial. And as to the medical expenses issue, Edwards argued that, although Dr. Goldman's report had not included the cost of the course of treatment he opined to be reasonable and necessary for a person with normal cervical anatomy, that omission was harmless because Gines' counsel "routinely present damages for all of their various clients who have been treated by all kinds of doctors" and accordingly were familiar with the "whole gamut" of treatment costs. Gines' counsel did not rebut this contention. After the trial court confirmed with Dr. Goldman that he did not include in his report a cost estimate—particularly as to physical therapy—the trial court specifically asked Gines' counsel if he was "really surprised [by] what a physical therapist charges" and explained to counsel that the answer to that question "goes to the harmlessness" of Edwards' omissions. Gines' counsel answered, "no, I'm not surprised." And, apart from reasserting that before that day he "didn't know what [Dr. Goldman] was going to answer" to the question of approximate cost, Gines' counsel did not otherwise explain to the court why he was

nonetheless unprepared to deal with Dr. Goldman's cost estimate.

¶26 The court permitted Dr. Goldman to testify as to the fact that Gines only suffered a temporary sprain/strain and as to the reasonable and necessary treatment related to treating a temporary sprain/strain for a person with normal cervical anatomy, because it determined that those opinions had been fairly disclosed in Dr. Goldman's report. The court decided that Dr. Goldman would not be permitted to testify about what treatment would be required for someone with Gines' altered anatomy, because that opinion was not in his report. And as to the costs of the treatment for the temporary injury, the court concluded that even if Dr. Goldman had not included an exact cost for the treatment he recommended, he had fairly disclosed in his report that a person with "a temporary sprain/strain of the cervical spine would incur diagnostic costs and receive treatment consisting of . . . physical therapy, medication, and home exercises." The court then determined that the failure to disclose the $10,000 estimate for the cost for reasonable medical treatment for a normal person was harmless in light of both counsel's experience litigating tort cases.

¶27 To support his arguments on appeal, Gines cites the advisory committee notes to rule 26 of the Utah Rules of Civil Procedure, which state that "courts are expected to enforce [the] requirement" that the expert provide "a signed report containing a complete statement of all the opinions the expert will express" by "making clear that experts will not be allowed to testify beyond what is fairly disclosed in a report." Gines appears to argue that this statement indicates that the provisions applicable to expert reports in rule 26 unequivocally required the court not to permit Dr. Goldman to testify outside of the contents of his report under any circumstances. He also claims that the 2011 amendments to rule 26 "drastically altered civil discovery practice in Utah" and that "[t]he most significant changes deal with expert discovery." But he does no more than that. He does

not cite the actual language from rule 26 itself or attempt to analyze the rule in light of his argument that the trial court erred.

¶28   As an initial matter, we observe that while the advisory committee notes to our rules of civil procedure "merit great weight in any interpretation" of the rules, we are not bound by them. *Burns v. Boyden*, 2006 UT 14, ¶ 18 n.6, 133 P.3d 370. Thus, in order to persuade us that the trial court erred, he must do more than simply quote the advisory committee notes. He must at least support his argument with the language of the rules themselves.

¶29   Rule 26 states that the expert's report "shall contain a complete statement of all opinions the expert will offer at trial and the basis and reasons for them" and further provides that the expert "may not testify in a party's case-in-chief concerning any matter not fairly disclosed in the report." Utah R. Civ. P. 26(a)(4)(B). However, rule 26 also specifically addresses the consequences for failing to disclose a matter in discovery and exceptions to those consequences, something Gines does not acknowledge in his analysis. Subsection (d)(4) provides two exceptions to the imposition of the penalty for failure to disclose: "If a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." We have also consistently applied the "harmless" and "good cause" exceptions when analyzing disclosure errors regarding expert witnesses. *See, e.g.*, *Baumann v. The Kroger Company*, 2016 UT App 165, 381 P.3d 1135, *cert. granted*, 384 P.3d 566 (Utah Oct. 31, 2016) (No. 20160686); *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, 370 P.3d 963; *R.O.A. General, Inc. v. Chung Ji Dai*, 2014 UT App 124, 327 P.3d 1233.

¶30   Here, the trial court permitted Dr. Goldman to testify regarding the temporary nature of Gines' injury attributable to the accident and the reasonable course of treatment for such an injury because it determined that the substance of that testimony

was fairly disclosed in Dr. Goldman's report. And invoking the "harmless" exception under rule 26(d)(4), the court permitted testimony regarding costs of the recommended treatment to resolve a temporary strain for a person with normal cervical anatomy because it determined that the costs of the treatment outlined by Dr. Goldman were not a surprise to Gines' counsel.

¶31   Gines does not engage with the bases for these determinations—either that certain subjects had been fairly disclosed in Dr. Goldman's expert report or that the failure to disclose the cost estimate for treatment did not harm Gines. *See Allen v. Friel*, 2008 UT 56, ¶ 4, 194 P.3d 903 (noting that, in order for an appellant to persuade a reviewing court that the district court's determinations were in error, the appellant must engage with and challenge the actual bases of the district court's decisions); *Duchesne Land, LC v. Division of Consumer Prot.*, 2011 UT App 153, ¶ 8, 257 P.3d 441 (concluding that the appellants had failed to persuade the court "that the district court's ruling constituted error" where the appellants failed to address "the actual basis for the district court's ruling"). Instead, after quoting the advisory committee notes, Gines simply asserts that the court should not have permitted Dr. Goldman to testify outside of the contents in his report. This is not sufficient to carry the burden of persuasion in light of the actual language in rule 26 and the trial court's invocation of both the "fairly disclosed" standard in subsection (a)(4)(B) and the "harmless" exception in subsection (d)(4) as bases for his decision.

¶32   Further, Gines only briefly and generally contends, for the first time in his reply brief, that it was error for the court to rely on the sophistication of counsel in its harmlessness analyses. But the primary basis for the trial court's decision to admit Dr. Goldman's testimony regarding costs of treatment was that, in light of Gines' counsel's actual knowledge and experience in the area, there was no surprise about the cost of treatment or harm through the lack of disclosure, a conclusion that counsel did not dispute and even appeared to concede at the time. *See*

*Commonwealth Prop. Advocates, LLC v. U.S. Bank Nat'l Ass'n*, 2013 UT App 300, ¶¶ 4, 6, 318 P.3d 770 (declining to reach appellant's "belatedly raised arguments" in its reply brief where the appellant "failed to challenge the primary basis for [the court's] decision in its opening brief").

¶33 Accordingly, we affirm the trial court's determinations regarding the admissibility of the challenged portions of Dr. Goldman's testimony.

### III. The Trial Court Did Not Err When It Denied Gines' Motions for Judgment as a Matter of Law on Apportionment and Medical Damages.

¶34 Gines argues that "the trial court erred when it denied [his] multiple motions for judgment as a matter of law on apportionment and medical economic damages." Gines contends that, with regard to the apportionment of his back condition and associated medical expenses, "[t]he central issue of this case was to determine what was caused by the accident and what was not caused by the accident." He argues that the evidence Edwards provided would allow the jury to apportion damages on no more than an arbitrary or speculative basis. As a result, he asserts that under *Harris v. ShopKo Stores, Inc.*, 2013 UT 34, 308 P.3d 449, this uncertainty entitled him to judgment as a matter of law in the full amount of the past medical expenses found by the trial court—$61,296.60.

¶35 As a general rule, in a tort case "a plaintiff is entitled to recover for all harm that is proximately caused by [a] defendant's negligence," including aggravation of a preexisting condition. *See id.* ¶¶ 23–24. It is the plaintiff's burden to prove causation in an action for negligence. *See Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 21, 176 P.3d 446. Furthermore, "[a] plaintiff may not recover damages for any pre-existing condition or disability she may have had *which did not result from any fault of the defendant*," and although a plaintiff may recover damages for aggravation of a preexisting condition, "[he] may only do so

to the extent that the aggravation *was proximately caused by the defendant's negligence.*" *ShopKo*, 2013 UT 34, ¶ 24 (citation and internal quotation marks omitted).

¶36 Thus, in cases where apportionment of the damages between a plaintiff's preexisting condition and a defendant's negligence is at issue, the jury should apportion damages in a way that reflects the relative contribution of both the historical condition and the intervening event. *See Tingey v. Christensen*, 1999 UT 68, ¶ 15, 987 P.2d 588 ("[I]f the jury can find a reasonable basis for apportioning damages between a preexisting condition and a subsequent tort, it should do so[.]"). And where the evidence adequately raises a question of apportionment, "the burden is on the defendant to demonstrate that apportionment is possible." *ShopKo*, 2013 UT 34, ¶ 28. This approach stems from the principle that "once the fact of damage is established, a defendant should not escape liability because the amount of damage cannot be proved with precision." *Tingey*, 1999 UT 68, ¶ 14 (citation and internal quotation marks omitted). As a result, if a defendant does not carry his burden—if, despite the evidence provided by the defendant, the jury still "finds it impossible to apportion damages"—then the jury "should find that the tortfeasor is liable for the entire amount of damages." *Id.* ¶ 15.

¶37 Nevertheless, the Utah Supreme Court has recognized that "it is rarely easy to determine the causal contribution of a preexisting condition to a plaintiff's pain and injury." *ShopKo*, 2013 UT 34, ¶ 27 ("The '[o]bjective symptoms and the physical basis of . . . ailment[s] are often difficult to discover, analyze and demonstrate to others.'" (alterations and omission in original) (quoting *Brunson v. Strong*, 412 P.2d 451, 453 (Utah 1966))). Thus, in cases requiring allocation of "causation between preexisting pathologies and a subsequent accident," the defendant must provide medical expert testimony, *id.* ¶ 34, and the expert testimony must provide the jury "some nonarbitrary evidentiary basis . . . to apportion damages," *id.* ¶ 32. This does not mean that the expert must "opine on the exact percentage . . . of the

injury attributable to [the plaintiff's] preexisting conditions." *Id.* ¶ 38. "In an ideal world, an expert would provide a precise estimation," but as a practical matter "we must account for the reality of medical uncertainty." *Id.* As a result, presentation of "a reasonable range of percentages" or "a useful nonnumeric description" allocating causal attribution between an accident and the plaintiff's preexisting condition will be sufficient to provide the jury with a nonspeculative basis to apportion. *Id.* Thus, the "determinative question [here] is whether the expert testimony has supplied the jury with [such] a nonarbitrary basis for apportioning damages." *See id.*

¶38    In ruling on Gines' pretrial motion for partial summary judgment, the trial court concluded that Gines had already established certain components of his negligence claim against Edwards as a matter of law. The court determined that Edwards had been negligent and that there was no dispute of material fact regarding the dollar amount of the past medical expenses. However, the court decided that there was a dispute of material fact as to whether Edwards' negligence was "the cause in fact and proximate cause of the injuries suffered by [Gines]." In particular, the court concluded that while it was undisputed that Gines suffered "at least a musculoskeletal injury to [his] cervical spine, of the sprain/strain variety" along with "a temporary aggravation and superimposition upon [Gines'] previously injured and altered symptomatic cervical spine anatomy," a dispute remained about whether "Gines suffered more serious injury as a result of this accident" requiring the surgery and related treatment that formed the bulk of the past medical expenses he sought to recover. As a result, the court concluded that Gines was not entitled to judgment as a matter of law on the issues of causation and whether he was entitled to the full amount of the past medical expenses or future medical care.

¶39    The case then went to trial on the issues of causation and damages. Specifically, the jury was asked to determine the extent of Gines' injuries caused by the accident—in other words,

whether the accident caused Gines any harm beyond a "sprain/strain" and a temporary aggravation of his preexisting back condition. Depending on the answer to that question, the jury was then required to determine the amount of damages associated with the injury it decided had resulted from Edwards' negligence. The jury ultimately awarded Gines $10,000 for his past medical expenses and $7,500 for noneconomic damages, with no award for future medical expenses. In other words, by awarding so much less than the full amount of past medical damages and no future damages, the jury must have concluded that the accident did cause Gines some injury but not much more than the limited musculoskeletal sprain and temporary aggravation of his preexisting spinal condition that Edwards had argued for.

¶40    Gines' claims of error on appeal implicate both the jury's apparent causation determination and its damages award. He challenges the jury's damages award by arguing that Edwards provided the jury only an arbitrary basis on which to conclude that the accident did not result in long-term effects, including the spinal condition that required the 2011 surgery. He also argues that the jury's actual medical economic damages award of $10,000 is "nonsense," because it does not rationally correlate with the actual past medical bills he incurred or the treatment he actually received. Thus, the errors Gines identifies on appeal seem to fall into two categories related to apportionment: evidence of the nature and extent of the injury or harm he suffered from the accident and the evidentiary basis for the jury's resulting damages award.

¶41 Gines' characterization of the components of an apportionment analysis is consistent with the way our supreme court described the apportionment of damages between an accident and a plaintiff's preexisting condition in *Harris v. ShopKo Stores, Inc.*, 2013 UT 34, 308 P.3d 449. There, the supreme court determined that the apportionment of damages necessarily depends on expert evidence regarding the relative extent to

which the potential sources of a plaintiff's claimed injury contributed to the condition for which he or she seeks compensation at trial, the possible causes in that case being a fall on the defendant's premises and a preexisting back condition. *Id.* ¶ 37. In particular, the court held that a defendant claiming apportionment cannot meet his or her burden by providing expert testimony that does no more than establish that the plaintiff had a relevant preexisting condition which *could* have contributed to the plaintiff's current pain. *Id.* Rather, in order for the jury to consider the apportionment of damages between an accident and a preexisting condition, there must be evidence regarding "the *extent* to which [a plaintiff's] [preexisting] conditions contributed to her pain, if at all" by providing "a relative comparison between the proposed causes of [a plaintiff's] pain." *Id.* Thus, "the determinative question is whether the expert testimony has provided the jury with a nonarbitrary basis for apportioning damages" between the results of the defendant's negligence and the harm caused by the plaintiff's preexisting condition. *Id.* ¶ 38.

¶42 Accordingly, to determine whether the jury properly awarded damages, we must first consider the evidence presented by Edwards about the extent of harm caused by Gines' preexisting condition versus Edwards' negligence. We will then address whether the jury's damages award finds adequate support in the evidence presented at trial.

A. Apportionment of Injury

¶43 On appeal, neither party questions whether Gines was suffering from a preexisting spinal condition at the time of the accident. Rather, Gines contends that Edwards provided only a speculative basis to apportion the harm (and thus the damages) between the accident and Gines' preexisting condition. *See ShopKo*, 2013 UT 34, ¶ 28 (explaining that "the burden is on the defendant to demonstrate that apportionment is possible where there is any uncertainty").

¶44    At trial, Gines argued that the accident caused all of the cognizable harm he suffered from the point of the accident forward by permanently aggravating his preexisting back condition, and that, but for the accident, he would not have had to undergo surgery in 2011. Gines invoked the "eggshell plaintiff" concept to support his argument, which he described as requiring that "you take your plaintiff as you find them." He compared himself to a "walnut that[] already [had] three or four or five cracks in it" at the time of the accident and stated that the accident itself was a hammer blow that "shatter[ed]" the walnut. Gines focused on convincing the jury that all of the injury associated with the past medical expenses was a result of Edwards' negligence. To that end, Gines' treating physicians testified that, in their opinion, the accident "changed [Gines'] story" by exacerbating the symptoms associated with Gines' spinal condition to the point that he needed additional surgery.

¶45    The defense countered that the injury caused by Edwards' negligence was nothing "more serious" than a temporary aggravation of Gines' preexisting spinal condition, characterizing the injury as merely a temporary overlay on an ongoing and rapidly degenerating spinal condition that, before the accident, was already inevitably on its way toward another surgery. Defense counsel pointed to evidence that Gines' own doctor, "just a month before this accident[,] . . . was noting that [Gines' preexisting spinal] condition was getting worse and worse" and had already determined that "surgery would be best for [Gines]." Edwards also supported his theory of injury with the expert testimony of Dr. Goldman. Dr. Goldman testified that, in his opinion, "whatever Mr. Gines is experiencing right now is entirely 100 percent due to his previous injuries, his ongoing degenerative condition," and not due to Edwards' negligence. He noted that at the time of the accident, Gines "already had significantly altered spinal anatomy" and that before the accident there had already been "a lot of discussion" between

Gines and his treating physicians about "his progression and his problems, and even the question of surgery being raised."[4] He testified that, based on his review of the pertinent records and the physical examination, he believed that Gines had suffered no more than a "temporary exacerbation of his preexisting already injured anatomy," or, in other words, an injury that had been merely "superimposed upon his prior cervical status." Dr. Goldman stated that, in his opinion, Gines' injury was consistent with similar "musculoskeletal dysfunction" injuries that typically resolve within a three-to-six month period following the accident. And he testified that, even if it was ultimately reasonable and necessary for Gines to undergo spinal surgery, that surgery was required by his preexisting spinal condition, not the accident, because "[y]ou don't operate on" a "musculoskeletal sprain/strain injury" like the kind Gines suffered in the collision.

¶46   Gines is correct that Edwards had the burden of providing the jury with "a reasonable basis for apportioning damages between a preexisting condition and a subsequent tort." *Tingey v. Christensen*, 1999 UT 68, ¶ 15, 987 P.2d 588. But the evidence Edwards provided to the jury regarding the extent of harm caused by the accident was not uncertain in a way that would make damages "impossible to apportion." Rather, this seems to be one of those rare cases in which, however

---

4. For example, one of Gines' primary care physicians testified that Gines' pain had been "escalating" before the December 2009 car accident, that "[h]e was not getting better," and that only a couple of months before the accident the physician had discussed with Gines that either physical therapy or surgery were options to attempt to alleviate the pain. The jury also received copies of Gines' medical records, which showed that, in the few months before the accident, the two lower levels in his neck (that were later fused in the postaccident surgery) were already degenerating and causing him significant pain.

complicated the underlying medical evidence may have been, the jury's determination of "the causal contribution of a preexisting condition to a plaintiff's pain and injury" came down to a simple choice: either the *preexisting condition* caused all the harm related to Gines' need for surgery, as Edwards argued, or the *accident* did, as Gines argued. *See ShopKo*, 2013 UT 34, ¶ 27. Neither party presented evidence or argument to support a more nuanced apportionment of causation between the accident and Gines' preexisting condition. And, importantly, given Gines' argument that Edwards failed to meet the *ShopKo* burden, the defense presented expert evidence that Gines' progressively degenerating spine, not the accident, was the entire cause of the condition which led to the 2011 surgery and that the accident only caused a temporary aggravation that would have resolved within months.

¶47    In other words, by presenting evidence that the accident caused zero percent of the lasting harm that ultimately led to Gines' surgery and that preexisting conditions were 100 percent responsible, Edwards's expert provided the jury with "a useful nonnumeric description" as well as "a reasonable range of percentages" from which it could determine the relative contributions of Edwards' negligence and Gines' preexisting condition to the *permanent* harm for which Gines sought compensation at trial. *See id.* ¶ 38. Similarly, Edwards' expert provided the jury with a nonarbitrary basis to determine the extent of harm that *was* caused by the accident—all, or 100 percent, of the sprain/strain that *temporarily* aggravated Gines' preexisting spinal condition.

¶48    Accordingly, we reject Gines' contention that there was insufficient evidence to provide the jury with a nonarbitrary basis for apportioning the cause of Gines' postaccident condition—and his consequent need for surgery—between the accident and his preexisting condition. We now consider whether, in light of this conclusion, the jury's actual damage award is supported by the evidence.

B.      Damages Award

¶49    It is well settled that we "will uphold [a jury's] calculation of damages so long as there is competent evidence to sustain it." *Cornia v. Wilcox*, 898 P.2d 1379, 1386 (Utah 1995); *see also Brunson v. Strong*, 412 P.2d 451, 453 (Utah 1966) ("The courts are and should be reluctant to interfere with a jury verdict and will not do so as long as there is any reasonable basis in the evidence to justify it."). "Within the limits of reason it is [the jury's] prerogative to place [its] own appraisal upon the evidence which impresses [it] as credible and to draw conclusions therefrom in accordance with [its] own best judgment." *Balderas v. Starks*, 2006 UT App 218, ¶ 24, 138 P.3d 75 (alterations in original) (citation and internal quotation marks omitted). "[A]n award of damages will not be deemed unreasonably low as long as it comports with some rational appraisal or estimate of damages based on evidence before the jury." 25A C.J.S. *Damages* § 466 (2016).

¶50    The jury awarded Gines $10,000 in medical economic costs, $7,500 in pain and suffering, and $0 in future costs. Gines argues that even if the jury determined that his injury from the accident was only temporary, the damages award cannot stand, because Edwards did not provide the jury with a reasonable way to apportion the medical costs between the temporary injury that Edwards urged and the treatment Gines received for his ongoing back condition. He contends that Dr. Goldman provided no opinion about when his temporary aggravation resolved or what treatment he would have required, given his altered anatomy—information Gines argues is essential to calculation of any medical economic damages award. He claims this uncertainty in the evidence supporting apportionment of damages should have been resolved in his favor, resulting in an award of all the past medical expenses as a matter of law. As a corollary, he claims that the $10,000 the jury awarded for past medical expenses is a "nonsense answer" to the question of how much Gines should have been awarded due to Edwards' negligence, because there was no rational basis in the evidence to allow the jury to allocate

specific components of the medical treatment he received after the accident between temporary injury and preexisting condition so as to arrive at a figure of $10,000 for treatment related only to the accident.

¶51    As we noted above, it is a reasonable inference from the jury's limited award for past medical expenses and its decision not to award anything for future medical expenses that the jury accepted Edwards' theory that the accident caused only a temporary injury and that Gines' preexisting spinal degeneration was the sole cause of his 2011 surgery. Further, it is reasonable to infer that because the jury did not accept Gines' theory that the accident caused his need for surgery, it also rejected his position that the past medical procedures and costs related to Gines' surgery were the result of Edwards' negligence. Thus, the jury had a reasonable basis for rejecting Gines' position that it ought to award him the entirety of the postaccident medical expenses. The question then becomes whether there was sufficient evidence to support the jury's $10,000 award for the costs of resolving the temporary injury caused by Edwards' negligence. We conclude that there was.

¶52    First, the jury could have based its award on Dr. Goldman's testimony. Dr. Goldman opined about the length of time reasonably necessary to resolve the temporary sprain/strain he believed the accident had caused, the kind of treatment that would have been required during that time frame, and the costs associated with such treatment. Although the treatment and the cost estimates Dr. Goldman described did not correlate precisely with the actual medical bills that Gines had incurred after the accident, they did provide a cap on the costs that Gines would reasonably have incurred as a result of Edwards' negligence had treatment focused solely on the temporary effects of the accident rather than the need for surgery to resolve the symptoms of the preexisting condition.

¶53    To begin with, Dr. Goldman testified about the amount of time it would have taken to resolve the temporary aggravation

of Gines' condition. He indicated that 85 to 90 percent of temporary musculoskeletal injuries (of the kind he concluded Gines had suffered from the accident) typically resolve within a three-to-six month period and that, in his opinion, Gines' injury fell within that range "for musculoskeletal dysfunction." He further stated that in his experience, even patients with "a very, very similar" or an "even worse" preexisting spinal condition than Gines, who had then been in similar accidents, usually returned to baseline "within a three or four, maximum six month window of time" after suffering temporary aggravation of a preexisting condition.

¶54   Dr. Goldman also provided the jury with a useful nonnumeric description of what the treatment would normally be like for a person who had suffered a temporary spinal sprain/strain and further explained that the treatment for someone with Gines' altered anatomy would not substantially differ. Dr. Goldman testified that the course of treatment to resolve the sprain/strain would include diagnostic tests, such as an x-ray or an MRI; medications, such as muscle relaxants and anti-inflammatories; and physical therapy, which would include "stretching, flexion, extension, [and] graduated strengthening exercises" that the patient could continue with at home. Dr. Goldman stated that all patients with a temporary sprain/strain would be approached "the same way" and given "the same treatment," regardless of whether the patient had a preexisting spinal condition like Gines, the only difference being how to modify the treatment plan based upon what the patient is or is not able to do as a result of such altered anatomy and associated conditions such as pain, for example. And Dr. Goldman testified that Gines may not have needed any additional treatment to resolve the temporary aggravation from the accident beyond what he would already have been doing "medication-wise and exercise-wise" to treat his preexisting condition.

¶55   Finally, having provided the time frame in which a temporary aggravation would have resolved and a description

of the course of treatment necessary, the defense then provided the jury a cap on how much the treatment Dr. Goldman described would have cost. Dr. Goldman testified that the cost of the treatment reasonably necessary to return a person to baseline from a sprain/strain that temporarily aggravated a preexisting spinal injury would be from $7,000 to $10,000. This estimate included diagnostic costs as well as those for physical therapy and medication over the three-to-six month period he thought reasonably necessary to resolve the condition. And Dr. Goldman testified that the "[t]he numbers [he] gave" for treatment costs "basically[] . . . are all the same" for a person with altered anatomy—that "there may [only] be a variation, a little up, a little down depending on what the patient can or cannot do."

¶56    In sum, although Dr. Goldman's testimony provided only a range of costs to resolve a temporary aggravation as opposed to an exact calculation, his cost estimate nonetheless provided a reasonable basis for the jury to determine the amount that would compensate Gines for the medical costs of Edwards' negligence. Dr. Goldman's estimate was supported by testimony about "a reasonable range" of time necessary to resolve a temporary aggravation of the kind he believed Gines suffered as well as "a useful nonnumeric description" of the kind of treatment required. *Cf. Harris v. ShopKo Stores, Inc.*, 2013 UT 34, ¶ 38, 308 P.3d 449 (acknowledging "the reality of medical uncertainty" and reasoning that "a reasonable range of percentages" or a "useful nonnumeric description" of the relative contribution of a preexisting injury and an accident can be enough to provide "the jury with a nonarbitrary basis for apportioning damages").

¶57    Thus, we conclude that the evidence that the defense presented through Dr. Goldman provided the jury with a "reasonable basis . . . to justify" awarding Gines $10,000 in past medical costs as well as no award for future costs. *See Brunson v. Strong*, 412 P.2d 451, 453 (Utah 1966).

¶58    Moreover, the jury could reasonably have based its medical costs award on testimony that Gines' own witness

provided. One of Gines' treating physicians testified that the hospital component of the surgery would cost "around $35,000 or $40,000" and that the surgery itself cost $12,100—that is, Gines' surgery and related hospital costs likely totaled between about $47,100 and $52,100. Subtracting the estimated hospital and surgery costs from the approximately $61,000 Gines incurred in total past medical expenses leaves a range of between $8,900 and $13,900 in past medical costs not directly related to the surgery. The jury's $10,000 medical economic damages award fell within this range. *See Cornia v. Wilcox*, 898 P.2d 1379, 1386 (Utah 1995). In other words, the jury need not have relied solely upon Dr. Goldman's testimony to arrive at its award; rather, the award for past medical expenses found support in the evidence as a whole.

¶59    Accordingly, because there was a "reasonable basis in the evidence to justify" the jury's damages award, *see Brunson*, 412 P.2d at 453, we see no reason to disturb it. As a result, we conclude that the court did not err in denying Gines' motions for directed verdict, judgment notwithstanding the verdict, and new trial.

CONCLUSION

¶60    Gines has not persuaded us that the trial court exceeded its discretion by admitting Dr. Goldman's expert report or in determining the scope of Dr. Goldman's testimony during trial. We also conclude that the trial court did not err when it denied Gines' motions for judgment as a matter of law on the issues of apportionment and medical economic damages. Thus, we affirm.

_____