**2018 UT App 152**

## THE UTAH COURT OF APPEALS

KTM HEALTH CARE INC.,
Appellee and Cross-appellant,

*v.*

SG NURSING HOME LLC DBA KOLOB CARE
& REHABILITATION OF ST. GEORGE,
AND APEX HEALTHCARE SOLUTIONS LLC,
Appellants and Cross-appellees.

Opinion
No. 20160558-CA
Filed August 16, 2018

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 100503405

Gary R. Guelker and Janet I. Jenson, Attorneys for
Appellants and Cross-appellees

Justin D. Heideman and Justin R. Elswick, Attorneys
for Appellee and Cross-appellant

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 KTM Health Care, Inc. (Pharmacy) and SG Nursing Home LLC dba Kolob Care & Rehabilitation of St. George (Nursing Home) entered into a written agreement for Pharmacy to become Nursing Home's exclusive provider of all pharmacy-related products and services. Soon after signing the contract, however, Nursing Home attempted to cancel its agreement with Pharmacy, apparently realizing that it was still contractually committed to a different provider. Pharmacy then sued Nursing Home, asserting claims for breach of contract as well as various fraud-related causes of action. Nursing Home defended the case,

in part, by arguing that the parties had been mutually mistaken about Nursing Home's ability to terminate its contract with its existing provider, and asserting that the parties had therefore never actually entered into an enforceable contract. Prior to trial, on Nursing Home's motion, the court determined that Pharmacy chose to "elect" its breach of contract remedies and that it would not be permitted to further pursue its fraud-based remedies.

¶2 The case proceeded to trial, and a jury determined that Nursing Home breached the contract and that Pharmacy was entitled to over $143,000 in damages, plus attorney fees, even though the jury instructions made no mention of attorney fees. However, the jury also determined that the parties had, in fact, been mutually mistaken about the terms of Nursing Home's contract with its previous provider. Believing that the jury's answers to the questions on the special verdict form were inconsistent, the trial court resubmitted the case to the jury. After briefly re-deliberating, the jury affirmed its breach finding, but changed its mutual mistake finding. It also amended its damages award by increasing the amount of consequential damages while eliminating any mention of attorney fees. Following trial, the court refused to award Pharmacy any prejudgment interest.

¶3 Both parties appeal. Nursing Home asserts that the trial court erred in resubmitting the case to the jury. Pharmacy asserts that the trial court erred by excluding one of its expert witnesses, by dismissing its fraud-based claims prior to trial, and by failing to award prejudgment interest. We affirm in part, reverse in part, vacate the trial court's judgment, and remand the case for the limited purpose of entering judgment in favor of Pharmacy on its breach of contract claim in an amount consistent with the jury's original damages award (less attorney fees).

## BACKGROUND

¶4 In August 2009, Adam Katschke and a business partner formed Pharmacy. Pharmacy began as an "open-door" pharmacy, which is a "typical retail community pharmacy" that

is open to the public. After operating as an open-door pharmacy for several months, Katschke and his business partner decided that they wanted to grow their business, and in 2010 started contacting various entities in southern Utah with the goal of becoming a "closed-door" pharmacy. A "closed-door" pharmacy typically is not open to the public but, instead, serves as a dedicated pharmacy for one or more entities such as long-term care facilities, nursing homes, or assisted living centers.

¶5    One of the entities that Pharmacy contacted was Nursing Home, a facility that billed itself as "the largest skilled nursing facility in Southern Utah." When Pharmacy initially contacted Nursing Home about becoming its pharmacy, Nursing Home already had an existing agreement with a different provider, but was considering a change due to "service issues" it was experiencing with that provider.

¶6    In March 2010, Katschke met with a representative (Manager) of Apex Healthcare Solutions, LLC, the company that owned Nursing Home and had supervisory authority over its employees. During the meeting, Manager indicated to Katschke that Nursing Home was interested in utilizing Pharmacy's services, but that Katschke had to be the specific pharmacist assigned to the account; no one else would do. Katschke indicated that he would be willing to make arrangements to serve as the face of Pharmacy in its relationship with Nursing Home, and to personally work with Nursing Home during the contemplated closed-door contract. Although they had apparently come close to agreement on material terms, Nursing Home and Pharmacy did not sign a contract at that meeting. According to Katschke, Nursing Home wanted Pharmacy "to go write it up and give [Nursing Home] some proofs" of a proposed contract.

¶7    After meeting with Katschke, Manager contacted Nursing Home's existing provider to determine whether it could terminate its contract. After that conversation, Manager "was under the impression that [Nursing Home was] on a month-to-month contract" with its existing provider, and that Nursing

Home would be able to terminate its contract and transition to a different provider as early as June 28, 2010. However, Nursing Home did not terminate its contract at that time. And Katschke, for his part, was unaware of the terms of Nursing Home's contract with its other provider.

¶8    Katschke also owned and operated another pharmacy in Nevada (Nevada Pharmacy), and Katschke was the sole pharmacist staffing that pharmacy. To honor Nursing Home's request that he be the face of Pharmacy for any relationship with Nursing Home, Katschke determined that Nevada Pharmacy would need to hire another pharmacist to operate it. Soon after the March 2010 meeting, believing that a contractual relationship with Nursing Home was imminent, Nevada Pharmacy made that hire, and agreed to retain a second pharmacist for a 36-month term beginning on May 1, 2010, at a rate of $45 per hour for a 40-hour week plus various benefits.

¶9    Meanwhile, Katschke began to renovate Pharmacy in order to come into compliance with regulations governing closed-door pharmacies. This involved adding shelving, countertops, pharmacy software, an alarm system, and a refrigerator. Pharmacy completed these improvements in April 2010, and incurred over $33,000 in expenses in doing so.

¶10    On May 25, 2010, after some additional negotiations, Katschke and Manager—on behalf of their respective entities—signed a contract whereunder Pharmacy would become Nursing Home's exclusive closed-door pharmacy beginning on June 28, 2010 and continuing for an initial one-year term. The agreement contained a provision allowing for automatic renewal of the agreement for additional one-year periods unless, at least ninety days prior to the expiration of the current contractual term, either party provided the other with written notice of its intent not to renew.

¶11    That same day, after the contract had been signed, Nursing Home's administrator (Administrator) contacted the existing provider to let it know that Nursing Home was "going

in a different direction." The provider responded by expressing its view that Nursing Home did not have the right to cancel the contract. Administrator informed Katschke of the issue in an email, but initially downplayed it, stating that he thought he could "get this resolved within a day or two."

¶12 Several days later, on June 7, however, Administrator sent another email to Katschke informing him that "apparently we are not going to be able to get out of" the contract with the other provider "until the end of October [2010]," despite just having signed a contract with Pharmacy. Administrator further explained that "[w]e . . . would like to do business with you but right now it looks like we don't have a choice other than to take a step back, at least for a while."

¶13 Later that month, after apparently making the determination that it was bound by its contract with the other provider, Nursing Home made the decision to renew its contract with that provider. The renewed contract was set to commence on July 1, 2010, just three days after its contract with Pharmacy was set to commence, and was renewable in one-year terms thereafter. Administrator gave Katschke the bad news on July 11, 2010, via email: "[W]e have decided to stick with [the other provider] for at least another year." Administrator's email did not mention Nursing Home's contract with Pharmacy.

¶14 Later that year, in October 2010, Pharmacy sued Nursing Home for (among other claims) breach of contract, fraud in the inducement, constructive fraud, intentional misrepresentation, and negligent misrepresentation.

¶15 As the case proceeded to trial, Pharmacy informed the court and Nursing Home of its intention to call a pharmacist (Pharmacy Expert) as an expert witness. Pharmacy Expert had experience dealing with closed-door pharmacies, and Pharmacy wanted him to testify about "the number of years for which [Pharmacy] can recover damages" for lost profits. Pharmacy Expert's proposed testimony included the opinion that the parties likely would have renewed the contract for at least six

years. Nursing Home moved to exclude that testimony, arguing that Pharmacy Expert's analysis was unhelpful and unreliable. The trial court granted Nursing Home's motion, reasoning that "there are not sufficient facts in this case to support the proposed testimony" that Nursing Home "would have renewed its pharmacy provider agreement with [Pharmacy] for at least six years had [Nursing Home] begun using [Pharmacy] for its pharmaceutical needs in 2010." Therefore, the trial court determined that Pharmacy Expert's proposed testimony should be excluded because it would not be helpful to the jury.

¶16    Also prior to trial, Nursing Home asked the trial court to force Pharmacy to "elect its remedy," arguing that Pharmacy "is seeking to recover two categories of damages that are wholly contradictory to one another." Nursing Home argued that "there must be an election of remedies in cases involving contracts and deceitful inducement because the recovery of both lost profits and reliance damages constitutes a double recovery." The trial court agreed with Nursing Home, determining that Pharmacy "has chosen to affirm its contract with [Nursing Home] and has elected money damages as the remedy for [Nursing Home's] alleged breach of that contract." From that premise, the court concluded that "the doctrine of election of remedies and the economic loss rule preclude [Pharmacy] from pursuing its tort claims against [Nursing Home] for fraud in the inducement, constructive fraud, intentional misrepresentation[,] and negligent misrepresentation."

¶17    The case then proceeded to jury trial on Pharmacy's claim for breach of contract. Pharmacy did not call a damages expert, choosing instead to rely on Katschke's testimony regarding damages. Katschke initially testified that Pharmacy would have realized $401,280 in profit during the first year of its contractual relationship with Nursing Home. Katschke arrived at that figure by starting with the pricing terms of the contract, making certain assumptions about the number of patients and other variables, and computing a one-year profit estimate. On cross-examination, Katschke acknowledged that his figure did not include certain

additional overhead costs, which he estimated to be approximately $43,000. In the end, then, Katschke testified that Pharmacy sustained approximately $358,000 in lost profits during the relevant one-year period.

¶18    Nursing Home countered that testimony with a damages expert (Damages Expert), who was employed as a financial analyst for Nursing Home's existing provider's parent company, which Damages Expert characterized as the "largest long-term care or closed-door pharmacy operator in the country." Damages expert offered his opinion that, not only did Pharmacy not sustain any lost profits, Pharmacy would have *lost* over $127,000 had it been Nursing Home's exclusive provider of pharmacy services for the one-year term of the contract. Damages Expert based his calculation on an analysis of the revenues received and expenses incurred during the year in question by Nursing Home's existing provider, and then adjusting that analysis based on various perceived differences between Pharmacy and the existing provider. On cross-examination, Pharmacy's counsel called into question several of the assumptions that Damages Expert made during his analysis.

¶19    At the conclusion of the trial, Pharmacy argued to the jury that Nursing Home breached the contract by deciding "to stick with [the other provider] for at least another year." Nursing Home, in contrast, argued that it was mistaken about its ability to terminate its contract with its other provider, and therefore the affirmative defense of mutual mistake applied.

¶20    Upon completion of closing arguments, the trial court submitted a special verdict form to the jury that contained a series of questions. The verdict form was nine pages long and quite complex, and after some of the questions it instructed the jury to proceed in one fashion if its answer was "yes," but to proceed in a different fashion if its answer was "no." In particular, after the question about mutual mistake, the verdict form stated as follows: "If you answered 'yes' [that mutual mistake existed], please proceed to the next question." After the next question, the jury was instructed, regardless of the answer,

to "[p]roceed to" the question "on the following page" and to complete the remainder of the verdict form. The instructions did not inform the jury that, if it found the existence of a mutual mistake, the parties' contract may be considered unenforceable.[1]

¶21 After deliberation, the jury found that Nursing Home entered into and breached a contract with Pharmacy. However, the jury also found that Nursing Home's "ability to terminate its contract with [the other provider] was a basic assumption or an important fact, upon which both" parties based their contract, and that, at the time the contract was formed, both Pharmacy and Nursing Home "were mistaken regarding [Nursing Home's] ability to terminate its contract" with the other provider. In addition, the jury found that Pharmacy sustained $143,989[2] in "Lost Profits," but that Pharmacy did not sustain any amount of "Consequential Damages." After a line entitled, "Total Damage Award," the jury wrote the phrase "$143,989 plus attorney fees."

¶22 After reviewing the special verdict form in open court, the trial court determined that "there are inconsistencies here." The court explained to the jury:

> An affirmative defense to the breach of contract is mutual mistake, and you found that there was [a] mutual mistake. If there was a mutual mistake made, then there was no contract. It never formed,

---

1. Indeed, in its post-verdict musings, the trial court stated that "[p]erhaps on this one we should have said if you find mutual mistake . . . stop your deliberations, sign the jury verdict form and return it."

2. While this figure is certainly within the range of damages discussed by Katschke and Damages Expert, it is unclear from the record how this figure was derived. Neither Katschke nor Damages Expert used this figure, and neither side's counsel advocated for its application during closing argument.

and so you couldn't award damages. And rather than have this go up on appeal with that instruction, I would like you to go back and consider if, in fact, you found by clear and convincing evidence that there was [a] mutual mistake . . . , then you can't find a contract and find damages.

¶23 The court then referenced the jury's hand-written award of "attorney fees," and made the following statement to the still-empaneled jury:

As a matter of fact, the only time attorney[] fees can be awarded is if it's in the contract or if there's a statute. There was no statute that would be involved, and if you read—and I'm sure that you did—the contract did not have an attorney[] fees clause. If there had been one, we would have been arguing about it and about the amount. And since it's not, your suggestion here plus attorney[] fees is also [—] I guess as a matter of law I can't do that.

¶24 The court then resubmitted the case to the jury. The court did not restrict the number of questions the jury could reconsider; rather, the court simply gave the jury another complete copy of the special verdict form, along with the "old one to review," and sent the jury back into the jury room. After re-deliberation, the jury reaffirmed its finding that Pharmacy and Nursing Home entered into a contract and that Nursing Home had breached that contract. However, the jury changed its prior finding of mutual mistake, this time answering "no" to the question of whether Nursing Home's "ability to terminate its contract with [the other provider] was a basic assumption, or an important fact, upon which both" parties based their contract. The jury also amended its damages award. The jury again found that Pharmacy suffered "Lost Profits" of $143,989, but this time—after the court informed it that attorney fees were not recoverable—found that Pharmacy had also suffered "Consequential Damages" of $120,000. The second damages

verdict contained no mention of attorney fees. After it returned the second verdict form, the jury was discharged.

¶25    After trial, Pharmacy submitted a proposed judgment calculating its total damages as $603,980.60, apparently arriving at that figure after taking the jury's award and adding interest at a rate of 1.5% per month, pursuant to a term of the contract. Nursing Home objected to the proposed judgment, arguing that Pharmacy's proposed judgment was "based on an improper prejudgment interest rate." Specifically, Nursing Home asserted that the contract's rate of 1.5% per month applied only to penalties on "unpaid balances" and "invoices" and did not apply to the jury's damages award because Pharmacy "never actually provided any drugs or medical supplies to [Nursing Home's] patients." Nursing Home also argued that if prejudgment interest were appropriate, it should be calculated at 10% per annum. The trial court, however, determined that an award of prejudgment interest was inappropriate, no matter the rate, because the jury could not have reached its judgment amount using "fixed standards of valuation," and must instead have reached its verdict based on "its best judgment."

ISSUES AND STANDARDS OF REVIEW

¶26    Both parties appeal, and together raise four issues for our review. Nursing Home raises one issue in its appeal, and Pharmacy raises three issues in its cross-appeal.

¶27    Nursing Home argues that the trial court should not have resubmitted the case to the jury after reviewing the jury's first special verdict form. As we explain below, *infra* ¶ 46, we review this issue for abuse of discretion.[3]

---

3. Nursing Home also argues that the evidence was insufficient to support the jury's $120,000 award of consequential damages. As we discuss below, we conclude that the trial court should not

(continued…)

¶28 In its cross-appeal, Pharmacy first argues that the trial court should have allowed Pharmacy Expert to testify. "We review a district court's decision to admit or exclude expert witness testimony for an abuse of discretion and will not reverse that decision unless it exceeds the limits of reasonability." *Conocophillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 12, 397 P.3d 772.

¶29 Pharmacy next argues that "[t]he trial court erred in determining that the economic loss rule and doctrine of election of remedies required dismissal of [Pharmacy's] fraud-based claims." "The availability of a remedy is a legal conclusion that we review for correctness." *Ockey v. Lehmer*, 2008 UT 37, ¶ 42, 189 P.3d 51.

¶30 Finally, Pharmacy argues that the trial court erred by determining that Pharmacy was not entitled to prejudgment interest. A trial court's decision regarding prejudgment interest is a question of law that we review for correctness. *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 16, 82 P.3d 1064.

## ANALYSIS

### I. Nursing Home's Appeal

¶31 Nursing Home argues that the trial court erred by re-submitting the case to the jury after it perceived inconsistencies in the jury's answers to some of the questions on the special verdict form. As Nursing Home sees it, the trial court could have "reconciled" the jury's answers to the questions, and therefore should not have sent the jury back for additional deliberation. To support its argument, Nursing Home cites several Utah cases

---

(…continued)
have resubmitted the amount-of-damages issue to the jury at all, and because we reach that conclusion, we need not address Nursing Home's sufficiency-of-the-evidence argument.

instructing trial courts not to "presume inconsistency" in a jury's answers to questions on a special verdict form; instead, "[w]here the possibility of inconsistency in jury interrogatories or special verdicts exists," courts are instructed to "seek to reconcile the answers if possible." *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1083 (Utah 1985); *see also Neff v. Neff*, 2011 UT 6, ¶¶ 49, 76, 247 P.3d 380 (stating that "with regard to a claim that a jury verdict is internally inconsistent, we resolve any inconsistency in favor of giving effect to a jury verdict," and that "we will seek to reconcile the answers if possible" (quotation simplified)); *Tooele Associates Ltd. P'ship v. Tooele City*, 2012 UT App 214, ¶ 10, 284 P.3d 709 (stating that a court's "duty is to reconcile special verdicts if possible").

¶32 This rule—imposing a strict duty on trial courts to reconcile potentially inconsistent answers on a special verdict form, if possible—makes perfect sense in the context in which each of these cases arose: when a court is presented with a potential inconsistency *after* the jury has been discharged. Each of the cases Nursing Home cites arose in this procedural posture. *See Neff*, 2011 UT 6, ¶ 31 (reviewing a post-trial motion for judgment notwithstanding the verdict); *Bennion*, 701 P.2d at 1082 (reviewing a post-trial motion for new trial); *Tooele Associates*, 2012 UT App 214, ¶¶ 7–8 (reviewing competing post-trial motions). After a trial court discharges the jury, it is no longer possible to ask the jury about any arguable inconsistencies in its answers to the written questions on the special verdict form. In that situation, rather than re-convene a new jury and put the parties and the court to the time and expense of a second trial, trial courts should of course make every effort to view the special verdict form in a way that permits each of the answers to be reconciled with the others.

¶33 But we do not think that this same rule should apply—at least not with the same force—in a situation where an arguable inconsistency is brought to the trial court's attention while the jury remains empaneled. In that situation, it is still possible to ask the jury to clarify any inconsistencies in the verdict form.

This case presents the question of whether, and to what extent, a trial court has the discretion to ask a still-empaneled jury to re-deliberate to resolve perceived inconsistencies in a special verdict form. For the reasons we explain, we hold that, where a jury remains empaneled, a trial court need not strain quite so mightily to reconcile the answers on the verdict form as it must after the jury has been discharged, and that, in such a situation, trial courts possess discretion to both (a) determine whether an inconsistency exists in the jury's verdict, and (b) determine whether to resubmit the case to the jury for re-deliberation to resolve the perceived inconsistency.

A

¶34 The first issue that we must confront involves determining whether inconsistency is present in a jury verdict, and in calibrating the breadth of the discretion given to the trial court in making that determination. *See* Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable Federal Civil Jury Verdicts*, 28 Creighton L. Rev. 683, 713 (1995) (stating that "[t]he most pervasive difficulty with inconsistent verdicts . . . involves determining when they exist"). As noted, when the question arises after the jury has been dismissed, Utah law already provides answers to these questions: a court must strive to reconcile the answers given by the jury, and cannot order a new trial unless the jury's answers cannot be reconciled under "any reasonable view." *See Neff*, 2011 UT 6, ¶ 49 n.20 (stating that "[w]hen reviewing claims that a jury verdict is inconsistent, we must accept any reasonable view of the case that makes the jury's answers consistent"). To our knowledge, it is an open question in Utah whether those same rules apply in cases where the potential inconsistency is brought to the court's attention before the jury is discharged.[4]

---

4. Although our supreme court, in *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078 (Utah 1985), did not address the

(continued…)

¶35 Other courts and commentators, however, have addressed this issue, and most of them are of the view that the rules ought to be, and are, different if the issue arises prior to the jury's dismissal. *See, e.g.*, *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 821 (8th Cir. 1998) (stating that "[a trial] court has discretion to decide whether a jury's findings on a verdict form are incomplete, confusing, or inconsistent and whether to resubmit the claim to the jury"); *Veranda Beach Club Ltd. P'ship v. Western Surety Co.*, 936 F.2d 1364, 1381 (1st Cir. 1991) (stating that "if there was room for doubt, we believe that the trial court should be granted substantial latitude in determining whether or not the jury's response to a verdict form which the court prepared is clear and free from ambiguity"); *Clyma v. Sunoco, Inc.*, No. 03-CV-809, 2008 WL 3394616, at *5 (N.D. Okla. Aug. 8, 2008) (stating that "case law from other circuits makes clear that where a jury is still available, the trial court has the discretion to resubmit a special verdict form to the jury with a request for clarification; if the court elects not to seek clarification from the jury or the inconsistency is not noticed until after the jury has been

---

(…continued)

precise issue we address here, we view that case as generally supportive of our conclusions. In that case, the court held that the jury's answers could conceivably be reconciled, and therefore affirmed the trial court's decision to deny a post-trial motion regarding a potential inconsistency. *See id.* at 1083. After reaching its decision, however, the court (in dicta) chided the appellant for "fail[ing] to object to the verdict before the jury was discharged," and stated that "[t]he rule requiring an objection if there is some ambiguity serves the objective of avoiding the expense and additional time for a new trial by having the jury which heard the facts clarify the ambiguity while it is able to do so." *Id.* If the trial court were prohibited from seeking the jury's input in any event (because the verdict was technically reconcilable), there would have been no need to chide the appellant for its failure to object, because its failure to object would have been meaningless.

dismissed, the court must *then* attempt to harmonize the answers, or order a new trial" (emphasis added)).[5] We find these authorities persuasive.

---

5. *See also McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 738 (6th Cir. 2002) (stating that "we should be deferential to the determination of inconsistency made by a [trial] judge who has observed the jury during the trial, prepared the questions and explained them to the jury because he is in the best position to determine whether the answers reflect confusion or uncertainty" (quotation simplified)); *Romano v. U-Haul Int'l*, 233 F.3d 655, 671–72 (1st Cir. 2000) (holding that the trial court did not abuse its discretion when it decided to ask the jury to redeliberate regarding a verdict that was not necessarily inconsistent "under all possible views"); *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260–61 (5th Cir. 1988) (stating that "[w]e have consistently given the [trial] court wide discretion in deciding whether the jury's answers to the court's questions are clear," and affirming a trial court's decision to ask the jury to redeliberate regarding a verdict that could potentially have been reconciled); 35B C.J.S. *Federal Civil Procedure* § 1036 (2018) (stating that trial courts have "the discretion to decide whether a jury's findings on a verdict form are incomplete, confusing, or inconsistent," and that "[w]hen a verdict appears to be internally inconsistent, the safest course is to defer its acceptance, consult with counsel, give the jury supplemental instructions, and then recommit the matter for further consideration"); 33 Fed. Proc., L. Ed. § 77:329 (2018) (stating that "it is settled that a [trial] court has discretion to decide whether a jury's findings on a special verdict form are inconsistent"); Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable Federal Civil Jury Verdicts*, 28 Creighton L. Rev. 683, 725 (1995) (arguing that "courts should be given wide discretion in determining whether a jury's verdict is unacceptably inconsistent," and stating that "courts are not required to accept a jury verdict that is almost certainly derived from confusion, mistake, or indifference to the law, even though

(continued…)

¶36　The chief reason for taking a different approach in cases where the jury remains empaneled is not difficult to divine. In such cases, because the body that rendered the verdict remains available for consultation, a powerful option exists that does not exist later: the court can simply ask the jury what it meant. Exercising this option allows the court to go right to the source for clarification and remove any doubt about the jury's true intentions. After the jury makes clear its true intentions, there is no longer any need for judges or attorneys to spin their wheels speculating about the jury's true intent or about the verdict's various possible meanings, or arguing about whether the verdict can (or cannot) be reconciled.

¶37　In order to breathe life into this approach, however, trial courts must be given a measure of discretion in determining whether inconsistencies are present in a particular verdict. This is so for at least two reasons. First, by definition, such an issue will arise in a time-sensitive setting—with the jury still empaneled, there will not usually be time for comprehensive research or briefing on the issue. In most such instances, the court will be assisted only by some brief and improvised oral argument from counsel. The court is in the position of having to decide, more or less on the spot, whether the jury's answers are inconsistent, because once the court discharges the jury, it is no longer possible to seek the jury's input.[6] In this situation, there seems very little possible harm (as discussed further below, *infra*

---

(…continued)
there may be an insubstantial (but non-zero) chance that its origins lie elsewhere").

6. This is certainly not the only situation in which trial courts must make quick decisions. But in this situation—unlike most others, in which a court often can, for instance, revisit its decision to exclude evidence or sustain an objection—an improvident decision not to seek a jury's input can never be remedied, because a jury can never be recalled once discharged.

¶¶ 44–45) in asking the jury to re-deliberate, but there are almost certainly substantial benefits (e.g., clarity) to be gained, which potential benefits will evaporate as soon as the jury is discharged. In close cases, where facial or potential inconsistencies are present, trial courts should be encouraged to seek the jury's input while they still can, without having to worry about being reversed on appeal because, technically speaking and after comprehensive research and briefing, the original verdict turned out to be reconcilable after all. *See Veranda Beach Club*, 936 F.2d at 1381 (stating that, "if there was room for doubt" about whether the verdict contained inconsistencies, "the trial court should be granted substantial latitude" to seek the jury's input).

¶38    Second, the trial court will by that point have sat through the entire trial, and will have observed the jury's behavior and attitude. The trial court will also have approved the questions posed to the jury, and will have also provided the jury its instructions that it used to interpret and fill out the verdict form.[7] For these reasons, courts have recognized that the trial judge is "in the best position to determine whether the answers reflect confusion or uncertainty," *see Smith*, 151 F.3d at 821 (quotation simplified), and "is in an excellent position to evaluate whether

---

7. The trial court is under an obligation to properly instruct the jury, which duty includes providing a proper verdict form. *See Ames v. Maas*, 846 P.2d 468, 471 (Utah Ct. App. 1993) (noting that a trial court has a duty to instruct the jury on the law applicable to the facts of the case); *see also State v. Campos*, 2013 UT App 213, ¶ 42, 309 P.3d 1160 (stating that "[t]he duty to properly instruct the jury applies to the verdict form"). Indeed, the problem that eventually arose in this case could have been easily avoided had the parties and the court more carefully considered the language of the special verdict form, and simply instructed the jury that if it answered the questions regarding mutual mistake in the affirmative, that it should stop its deliberations and submit the verdict form to the court.

the jury will likely be able to resolve [the] uncertainty with proper guidance," *see Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir. 1988). For all of these reasons, the trial court is in an advantaged position to be able to discern—even in a time-sensitive setting—whether the jury's answers are inconsistent in a way that might be illuminated by additional jury input.

¶39    We therefore hold that—as long as the jury that rendered the verdict remains empaneled—a trial court is not under the same obligation to "reconcile" a jury's answers as it is after the jury is discharged. A trial court may seek the jury's input if the jury's answers are potentially inconsistent, or are inconsistent under any reasonable view. *See Veranda Beach Club*, 936 F.2d at 1381 (stating that a trial court may seek the jury's input "if there [is] room for doubt" about whether the verdict is inconsistent).[8]

B

¶40    Moreover, trial courts possess the latitude to seek the jury's input regarding potential inconsistencies, regardless of the particular form the verdict takes.

¶41    In some situations, trial courts—by force of rule—can (and sometimes must) seek the input of a still-empaneled jury regarding potential inconsistencies in its verdict. For instance, when a jury is asked to render a "general verdict" along with

---

8. It is important to note that our holding in this case is grounded in recognizing the trial court's discretion. We in no way mean to infer that a trial court *must* seek the jury's input in all similar situations. Indeed, in such situations, a trial court may elect not to resubmit matters to the jury for reconsideration, and may determine that the jury's answers can be reconciled without the need for additional deliberation. A trial court's decision *not* to seek additional jury input will also be reviewed for abuse of discretion.

"written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict," a trial court "shall return the jury for further consideration" if its "answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict," *see* Utah R. Civ. P. 49(b), and "may return the jury for further consideration" if its "answers are consistent with each other but one or more is inconsistent with the general verdict," *id.* In the case before us, however, the trial court did not ask the jury to render a general verdict accompanied by answers to written questions. Instead, the trial court submitted a special verdict form to the jury. Special verdicts are governed by rule 49(a), not by rule 49(b), and rule 49(a) is silent with regard to whether a trial court can, or must, send a jury back for re-deliberation if its answers to the questions on the special verdict form are inconsistent. *See generally* Utah R. Civ. P. 49(a).

¶42 Courts in other jurisdictions—interpreting language substantively identical to the language of the applicable Utah rule—have determined that resubmission is an exercise best left to a trial court's broad discretion, regardless of whether the issue arises under rule 49(a) (special verdicts) or 49(b) (general verdicts accompanied by interrogatories).[9] Indeed, "[t]he majority of [federal] circuits agree" that "resubmission of inconsistent verdicts" under either rule 49(a) or (b) is permissible. *Wavelinq, Inc. v. JDS Lightwave Products Group, Inc.*, 289 F. App'x 755, 761 (5th Cir. 2008); *see also Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1057 (9th Cir. 2003) (stating that, "where the jury is still available, a [trial] court's decision to resubmit an inconsistent [special] verdict for clarification is within its discretion"); *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir. 1988) (stating that, "[i]f the

---

9. Where the applicable federal rule contains identical language, Utah appellate courts often look to federal case law for guidance in interpreting our own rules. *See, e.g., Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, ¶ 16, 238 P.3d 1035.

inconsistency between special verdict answers is noticed prior to the dismissal of the jury, the trial court has the discretion to resubmit the issues to the jury with a request for clarification . . . whether or not the parties themselves request clarification"); *In re Stanton by Brooks v. Astra Pharm. Products, Inc.*, 718 F.2d 553, 575–76 (3d Cir. 1983) (observing that "in purely pragmatic terms, it seems terribly inefficient not to obtain clarification from a still-empaneled jury of the meaning of its answers and verdict, especially when we consider that unclarified inconsistent answers often necessitate a retrial of the entire case," and holding that the trial court "did not abuse its discretion in resubmitting 'special questions' to the jury, whether those questions be deemed to have been propounded under Rule 49(a) or 49(b)"). *But see McCollum v. Stahl*, 579 F.2d 869, 871 (4th Cir. 1978) (noting that rule 49(a) does not explicitly provide for resubmission, and holding that resubmission was therefore "not allowable"). State courts are in agreement. *See, e.g., Kanahele v. Han*, 263 P.3d 726, 737 (Haw. 2011) (stating that, when the jury is "still available, it [is] within the court's discretion" to resubmit the case to the jury to resolve a potential inconsistency in the answers on the special verdict form (quotation simplified)).

¶43 We find the majority interpretation persuasive. In our view, rule 49 of the Utah Rule of Civil Procedure should be interpreted to allow trial courts the discretion to seek the input of a still-empaneled jury, regardless of whether the jury was asked to return a special verdict or a general verdict with written interrogatories. In particular, we agree that "it seems terribly inefficient not to obtain clarification from a still-empaneled jury of the meaning of its answers and verdict, especially when we consider that unclarified inconsistent answers often necessitate a retrial of the entire case." *See Stanton*, 718 F.2d at 575–76; *cf. Bennion*, 701 P.2d at 1083 (stating that "[t]he rule requiring an objection if there is some ambiguity serves the objective of avoiding the expense and additional time for a new trial by having the jury which heard the facts clarify the ambiguity while it is able to do so"). When either a party or the court itself notices a potential inconsistency prior to the jury's discharge, a trial

judge has the option of seeking clarification from the jury, regardless of the specific form of the verdict.

C

¶44    A word of caution, however: when a trial court decides to send a case back to the jury for re-deliberation regarding a perceived inconsistency, the court must take pains to remain neutral, and to make sure that nothing in the court's communications to the jury about the inconsistency could possibly be construed as encouraging the jury to reach a particular result after re-deliberation. The danger is that, in some cases, a jury may "perceive [a judge's order to re-deliberate] to be judicial encouragement to alter its findings, . . . [even if] such influence is not intended." *See* Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable Federal Civil Jury Verdicts*, 28 Creighton L. Rev. 683, 724 (1995).

¶45    In order to avoid any such perception, whenever a trial court orders a jury to re-deliberate regarding an inconsistency, the court should explain to the jury the reasons it is being asked to resume deliberations, but must do so in a completely neutral and impartial way.[10] *See Smith*, 151 F.3d at 821–22 (stating that "[i]f a [trial] court decides to address a jury on an inconsistency in its findings[,] the court must not pressure or coerce the jury, either explicitly or subtly, to reach a certain result through its direction to the jury to reconsider its findings").

D

¶46    Because we have determined that the trial court had the discretion to both (a) determine whether an inconsistency was present in the jury's verdict, and (b) send the case back to the

---

10. We would urge trial courts to seek input from counsel regarding the content of such supplemental instructions before providing those instructions to the jury.

jury for clarification, we review the trial court's decisions for abuse of that discretion. *Cf. Mota v. Mota*, 2016 UT App 201, ¶ 6, 382 P.3d 1080 (reviewing a trial court's actions for abuse of discretion where the statute in question allowed the trial court discretion, stating that "because the statute is permissive, we review the court's ultimate decision . . . for an abuse of discretion"). In this case, the trial court gave the jury the opportunity to clarify two separate issues: the mutual mistake issue, and the attorney fees issue. In our view, the trial court did not abuse its discretion by seeking the jury's input on the mutual mistake issue, but did abuse its discretion by allowing the jury to re-deliberate regarding the amount of damages to be awarded.

1

¶47    The jury found both that (1) Pharmacy and Nursing Home entered into a contract and that Nursing Home breached that contract, and (2) both parties based the contract on the mistaken assumption that Nursing Home was able to "get out of" its contract with its previous provider.[11] "A mutual mistake of fact can provide the basis for equitable rescission . . . of a contract[.]" *Burningham v. Westgate Resorts, Ltd.*, 2013 UT App 244, ¶ 12, 317 P.3d 445; *see also Kendall Ins., Inc. v. R & R Group, Inc.*, 2008 UT App 235, ¶ 15 n.1, 189 P.3d 114 (stating that a "[m]utual mistake of fact makes a contract voidable and is a basis for equitable rescission" (quotation simplified)). Thus,

---

11. Neither party asks us to review the question of whether this situation could, as a matter of law, constitute a *mutual* mistake of fact. The terms of Nursing Home's contract with its previous provider were knowable facts; Nursing Home simply misinterpreted the contract. Moreover, Pharmacy was not a party to that contract, and played no role in its formation and had no apparent reason to be familiar with its terms. However, while we have our doubts that these facts could, as a matter of law, constitute *mutual* mistake, we do not reach this issue because the parties do not ask us to do so.

although the jury may not have been fully aware of the legal import of its findings, the jury essentially found that (1) no contract existed due to mutual mistake, (2) Nursing Home nonetheless breached the contract, and (3) Pharmacy was entitled to damages for breach of contract. These findings were at least facially inconsistent, because there would be no reason for the jury to determine that a contract had been breached and that damages should be awarded if the contract did not exist in the first place.

¶48  Nursing Home nonetheless asserts that these findings can be reconciled. It specifically argues that "the jury's determination that [Pharmacy] suffered $143,989 in lost profits simply reflects its initial determination that [Nursing Home] breached a contract with [Pharmacy]," and "does not address the next logical step of whether the contract is enforceable such that [Nursing Home] is liable for [Pharmacy's] lost profits." Nursing Home then asserts that "once the jury found that a mutual mistake had occurred, it was then the [trial] court's duty to make the legal determination that [Nursing Home] was not liable for [Pharmacy's] lost profits." *See Dishinger v. Potter*, 2001 UT App 209, ¶ 17, 47 P.3d 76 (observing that "the jury only finds the facts, and the court applies the law thereto and renders the verdict" (quotation simplified)). Essentially, Nursing Home argues that the jury's verdict can be reconciled because its mutual mistake finding, as a legal matter, nullifies its accompanying findings of breach and damages.

¶49  This argument is not without force. Indeed, if this issue had been brought to the trial court's attention for the first time after the jury had been discharged, the trial court's duty to reconcile the potentially-inconsistent answers may very well have compelled the conclusion that no contract existed. *See Tooele Associates*, 2012 UT App 214, ¶ 10; *see also Dishinger*, 2001 UT App 209, ¶ 17 (observing that courts enter judgment based on applying the law to the jury's findings of fact). But because the trial court became aware of the issue while the jury was still empaneled, and because the jury's verdict was at least

potentially inconsistent, the trial court was within its discretion to ask the jury to clarify the potential inconsistency. *See, e.g.,* *Romano v. U-Haul Int'l*, 233 F.3d 655, 671 (1st Cir. 2000) (determining that a court did not abuse its discretion by seeking additional jury input, even though "there was not an inconsistency within this verdict under all possible views"); *Richard*, 853 F.2d at 1260 (same).

¶50   In particular, we acknowledge that the trial court had legitimate doubts about whether the jury's answer to the mutual mistake question was based on a complete understanding of the law as applied to the facts. First of all, the verdict form contained an error, in that it did not tell the jury to stop its deliberations if it found the presence of mutual mistake. Second, and relatedly, while the jury heard plenty of testimony about Nursing Home's misunderstanding of the terms of its contract with its previous provider, neither attorney spent much time discussing mutual mistake, or its potential ramifications, during closing argument. Upon reviewing the verdict, especially under the time pressures associated with the situation, the trial court did not abuse its discretion by seeking the jury's input for clarification. We find no fault in the trial court's conclusion that the verdict was potentially inconsistent, nor with the trial court's decision to ask the jury to confirm that the result was indeed what it intended.

¶51   And we likewise perceive no infirmities with the trial court's statement to the jury regarding the potential inconsistency. The trial court objectively explained to the jury what the inconsistency was—specifically, that the jury's finding of mutual mistake was potentially inconsistent with its findings of breach and damages—and asked the jury to re-deliberate on those issues. We perceive nothing in the trial court's statement to the jury that could be interpreted, even subtly, as the trial court placing its thumb on the scale.

¶52   Accordingly, we conclude that the trial court acted within its discretion when it asked the jury to re-deliberate regarding the inconsistency in the verdict form between the jury's mutual mistake finding and the jury's breach and damages findings.

¶53    We reach a different conclusion, however, with regard to the trial court's decision to allow the jury to re-deliberate regarding the amount of damages. There was not even a potential inconsistency in the jury's answers on this issue, and therefore there was no basis to ask the jury for additional input.

¶54    In its initial verdict, the jury awarded Pharmacy $143,989 in "Lost Profits" damages and $0 in "Consequential Damages." In addition, the jury hand-wrote the words "plus attorney fees." In connection with its discussion that the jury's finding of mutual mistake and breach of contract was inconsistent, the trial court also explained to the jury that the court could award attorney fees only if authorized by statute or by contract, and that neither situation was applicable. After learning that information, and after its second round of deliberations, the jury amended its consequential damages award, increasing it from $0 to $120,000, but this time did not hand-write in any award of "attorney fees."

¶55    There was no plausible inconsistency regarding the jury's initial findings regarding the amount of damages, and therefore there was nothing for the jury to reconsider upon re-deliberation regarding the amount of damages. The jury very clearly and unambiguously determined that Pharmacy was entitled to $143,989 in lost profits, $0 in consequential damages, and that the jury wished for Pharmacy to also recover its attorney fees. The entire attorney fees issue could have—and should have—been handled simply by excising the hand-written words "plus attorney fees" from the first verdict form.[12] *See Meadowbrook, LLC*

---

12. The trial court could also have avoided trouble in this case by providing more careful instruction to the jury when it provided the jury with the second special verdict form. Specifically, the court could have instructed the jury to re-deliberate only regarding a certain limited number of questions, rather than

(continued…)

*v. Flower*, 959 P.2d 115, 117–18 (Utah 1998) (noting that "the determination of reasonable attorney fees is an issue generally left to the sound discretion of the trial court, not the jury" and that generally courts do not visit the issue of attorney fees "until one party has prevailed" (quotation simplified)). There was no reason for the trial court to give the jury an opportunity to reconsider the amount of damages it wished to award to Pharmacy.[13]

¶56    Accordingly, we conclude that the trial court abused its discretion by affording the jury a second opportunity to consider the amount of damages, and that this error was prejudicial, in that it resulted in a damages award that was $120,000 higher than it should have been. We therefore vacate the jury's second damages award, but not the jury's reconsidered answer regarding mutual mistake, and remand the case to the trial court with instructions to reinstate the damages amounts (less any attorney fees) that the jury awarded in its first verdict.

## II.  Pharmacy's Cross-Appeal

¶57    In its cross-appeal, Pharmacy raises three issues. First, it asserts that the trial court erred by excluding the testimony of Pharmacy Expert. Second, it asserts that the trial court erred by dismissing its fraud-based causes of action. Finally, it contends

---

(…continued)
allowing the jury to reconsider the form in its entirety. The trial court could also have opted to say nothing to the jury about the attorney fees issue while it remained empaneled.

13. Such opportunities, when afforded in the absence of any inconsistency in the verdict form, can potentially lead to jury mischief. In this case, for instance, it is hard to escape the conclusion that the jury altered its consequential damages award in order to make up for the fact that Pharmacy could not recover attorney fees in this case.

that it is entitled to prejudgment interest on its damages award, and that the trial court erred by failing to include such interest in the judgment. We address each of these issues, in turn.

A

¶58    First, we conclude that the trial court did not abuse its discretion by excluding Pharmacy Expert's testimony.

¶59    Under rule 702 of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). With expert testimony specifically, "[t]he ultimate question that must be answered" in deciding whether to admit it "is whether, on balance, the evidence will be helpful to the finder of fact." *Balderas v. Starks*, 2006 UT App 218, ¶ 27, 138 P.3d 75 (quotation simplified). Further, an expert's testimony must be "reliably applied to the facts" of the case at hand. Utah R. Evid. 702(b)(3); *see also Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶¶ 18–19, 242 P.3d 762 (holding that a doctor's expert testimony was reliably applied to the facts of the case where the doctor, drawing from his "specialized knowledge in removing foreign objects from childrens' ears," offered an opinion regarding a perforated eardrum). Trial courts have "wide discretion" to determine whether expert testimony is admissible. *Balderas*, 2006 UT App 218, ¶ 27.

¶60    Here, the trial court determined that Pharmacy Expert's proposed testimony "would not help the trier of fact to understand the evidence or a fact in issue," because the facts were "not sufficient" to support a conclusion that Nursing Home would have renewed its contract with Pharmacy for six years. Pharmacy disagrees, and asserts on appeal that one of the primary issues in the case was whether it was entitled to damages for one year, or whether it was also entitled to damages for additional renewal periods. Pharmacy contends that

Pharmacy Expert's testimony would have established that closed-door pharmacy contracts, like the one at issue here, "are almost always one-year contracts with auto-renewal clauses that are honored by the parties," and that Pharmacy Expert would have testified about "the expected length of similar closed[-]door pharmaceutical agreements."

¶61    But on the facts of this case, the parties never had an opportunity to contemplate whether they might want to renew the contract at the conclusion of the first year, because Nursing Home almost immediately decided not to continue its contractual relationship with Pharmacy. As noted above, either party had the right, pursuant to the non-renewal provisions of the contract, to end the contractual relationship after the first year. Nursing Home exercised this right—albeit in somewhat unconventional fashion—by email in July 2010, before the contractual relationship ever really got off the ground. Under these circumstances, there was therefore no need for expert testimony postulating about whether, and for how long, the parties might have renewed or extended the contract.

¶62    Thus, there existed a sound basis for the trial court's conclusion that Pharmacy Expert's proposed testimony would not have been helpful to the jury in determining any disputed issues, *see Balderas*, 2006 UT App 218, ¶ 27, and was therefore not "reliably applied to the facts" of the case, *see* Utah R. Evid. 702(b)(3). Accordingly, the trial court did not abuse its discretion when it excluded Pharmacy Expert's testimony from the jury's consideration at trial.[14]

---

14. Although Nursing Home does not raise this issue, there exists a separate basis upon which we could affirm the trial court's decision to exclude Pharmacy Expert's testimony: Pharmacy has not provided us with a transcript of the April 10, 2013 hearing at which the trial court made its decision to exclude the testimony. "[I]t is the appellant's burden to assemble,

(continued…)

B

¶63 Pharmacy next asserts that the trial court erred by dismissing its claims for fraud in the inducement, constructive fraud, intentional misrepresentation, and negligent misrepresentation, based on both (1) the election of remedies doctrine and (2) the economic loss rule. Pharmacy argues that neither the election of remedies doctrine nor the economic loss rule compel dismissal of its fraud-based claims. We agree with Pharmacy that the trial court erred in dismissing these claims

---

(…continued)

transmit, and perfect the record on appeal." *Gines v. Edwards*, 2017 UT App 47, ¶ 21, 397 P.3d 612 (citing Utah R. App. P. 11(c), (e)). An appellant is not necessarily required "to provide the transcript from every proceeding that occurred in a case," but an "appellant *is* required to 'include in the record a transcript of all evidence relevant to a finding or conclusion' that is being challenged on appeal." *Id.* (quoting Utah R. App. P. 11(e)(2)) (quotation simplified). In *Gines*, the appellant failed to provide a transcript of a hearing at which the trial court made a ruling regarding the admissibility of expert testimony. *Id.* ¶¶ 19, 21. On appeal, we concluded that the appellant had failed to carry its burden of demonstrating that the trial court abused its discretion in making its evidentiary ruling, especially where the trial court's written ruling specifically stated that "[t]he basis for the Court's ruling is set out in greater detail in the record of the hearing." *Id.* ¶ 19 (quotation simplified). Similarly here, the trial court's written ruling is brief, comprising only two substantive paragraphs, and specifically references "the reasons stated at the hearing" as part of the basis for the decision. Where Pharmacy challenges the trial court's ruling to exclude Pharmacy Expert, and the court's written ruling specifically references "the reasons stated at the hearing," and Pharmacy fails to provide us with a transcript of that hearing, Pharmacy has—like the appellant in *Gines*—failed to meet its burden of persuasion on appeal.

pursuant to the election of remedies doctrine, but affirm the trial court's decision based on the economic loss rule.

1

¶64 A party to a lawsuit cannot have a double recovery for a single loss. *Brigham City Sand & Gravel v. Machinery Ctr. Inc.*, 613 P.2d 510, 511–12 (Utah 1980) (holding that a party cannot "recover for the value of his property" and then also "recover the property"); *see also Help v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 68, 361 P.3d 63 (stating that "[i]f a defendant wrongfully retains possession of a plaintiff's cow, . . . the plaintiff may not recover both the cow *and* the reasonable value of the cow," and that the plaintiff "must elect one of these two remedies" (emphasis in original)). To prevent this, a defendant can invoke, and courts can apply, the doctrine of election of remedies. This doctrine "is a technical rule of procedure and its purpose is not to prevent recourse to any remedy, but to prevent double redress for a single wrong." *Royal Resources, Inc. v. Gibralter Fin. Corp.*, 603 P.2d 793, 794 (Utah 1979).

¶65 Prior to the advent of rule 8 of the Utah Rules of Civil Procedure, which allows a party to "state legal and equitable claims . . . *regardless of consistency*," *id.* R. 8(e) (emphasis added), a party had to elect its remedy (i.e., choose between theories of recovery that potentially relied on inconsistent facts) upon the filing of a complaint, *Help*, 2015 UT 81, ¶ 72. Modern pleading rules, however, as exemplified by rule 8, "dictate that a court may not require a plaintiff to elect between inconsistent claims prior to trial." *Id.* ¶ 76.

¶66 Our supreme court recently discussed the election of remedies doctrine at length. *See generally id*. There, a worker was injured "by a poisonous gas" after she added "sulfuric acid to an open-air pit containing waste products from [an oil] refinery." *Id.* ¶ 1. The worker sought and received workers' compensation benefits, and then later sued her employer in district court, alleging that the employer was liable for an intentional tort. *Id.* ¶¶ 1, 18. The court discussed the fact that the worker's two

remedies were inconsistent: in her workers' compensation case, which began in administrative proceedings, the worker was entitled to compensation only if the incident was "an accident," but in her district court case, the worker was entitled to compensation only if the incident constituted an "intentional tort" on the part of the employer. *Id.* ¶ 78. The court also noted that, as a practical matter, the worker was not able to pursue these two remedies as alternatives in a single lawsuit, because the workers' compensation case and the district court case had to be pursued in separate fora. *Id.* ¶ 79. The court nonetheless held that the worker could indeed pursue both remedies, *id.* ¶ 86, and summarized the election of remedies doctrine as follows:

> As an equitable judicial principle, the election of remedies doctrine should be applied to produce fair outcomes for litigants. It certainly applies to prevent the worker from obtaining a double recovery or recovering two inconsistent remedies. But it should not be applied to force the worker to make a binding election before knowing how a jury will resolve an intentional tort claim.

*Id.* ¶ 85; *see also id.* ¶ 79 (stating that "[i]f these two remedies could be pursued in a single forum, the answer would be simple" in that "[t]he worker could plead" both claims "in the alternative," and then "after the fact-finder made a final determination regarding the nature of the injury, the worker would elect the remedy available under the facts found").

¶67   In this case, the trial court dismissed Pharmacy's fraud-based claims because it perceived Pharmacy's claims as in tension with one another: to prevail on its contract-based claims, Pharmacy would need to prove the existence of the contract and rely upon its efficacy for recovery, but to prevail on its fraud-based claims, Pharmacy would need to prove that it had been defrauded in entering into the contract and would be asking for rescission as its remedy. The trial court concluded that Pharmacy was required to either affirm the contract and seek damages for

breach, or avoid the contract and seek reliance and/or punitive damages for fraud. The court then found that Pharmacy chose "to affirm its contract with [Nursing Home]" and "elected money damages as the remedy for [Nursing Home's] alleged breach" of the contract. Based on what it viewed as Pharmacy's "election of remedies," the trial court then dismissed all of Pharmacy's fraud-based causes of action.

¶68 This ruling was at odds with *Help*. Rule 8(e) permits Pharmacy to pursue inconsistent theories at trial (i.e., breach of contract and fraudulent inducement), and Pharmacy should not have had to elect its remedy until after the jury returned a verdict on those theories. *See Help*, 2015 UT 81, ¶¶ 79, 86 (noting that the worker "may not retain the inconsistent workers' compensation benefits and an award of tort damages" but that the worker only had to "elect" her remedy after the jury or administrative body determined the outcomes of those respective proceedings); *see also id.* ¶ 71 (stating that "if a plaintiff obtains a judgment authorizing a writ of replevin for the return of a cow wrongfully obtained by a defendant, the election is not final until the cow is returned," because "[i]f the plaintiff later discovers that the cow had died while in the defendant's possession, the plaintiff may still pursue a claim for payment of the reasonable value of the cow"). The trial court therefore erred in dismissing Pharmacy's fraud-based claims prior to trial under the doctrine of election of remedies.

2

¶69 We can nevertheless affirm the trial court's dismissal of Pharmacy's tort claims if those claims are barred by the economic loss rule, which was an alternative basis for the trial court's decision to dismiss those claims. We conclude that, at root, Pharmacy's fraud-based claims are based on alleged breaches of the same duties that Nursing Home agreed to assume under the parties' contract. *See Hermansen v. Tasulis*, 2002 UT 52, ¶ 16, 48 P.3d 235. Accordingly, because no "independent duty" is at issue, those claims fall within the purview of the

economic loss rule, and the trial court therefore did not err when it dismissed Pharmacy's tort claims pursuant to that doctrine.

¶70    "The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 32, 28 P.3d 669. When applied, "the economic loss rule prohibits tort claims for purely economic loss." *Gables at Sterling Village Homeowners Ass'n, Inc. v. Castlewood-Sterling Village I, LLC*, 2018 UT 04, ¶ 47, 417 P.3d 95. Utah's "formulation of the economic loss rule is that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care* under tort law." *Hermansen*, 2002 UT 52, ¶ 16 (emphasis in original) (quotation simplified).

¶71    Thus, to determine whether the economic loss rule bars a cause of action sounding in tort, we focus on the nature of the duties existing between the parties, and specifically on whether the duties existing between the parties arise as a result of the parties' contract or arise from other non-contractual sources. *See Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 27, 221 P.3d 234 ("Where the economic loss rule is at issue, the initial inquiry becomes whether a duty exists independent of any contractual obligations between the parties." (quotation simplified)). If the tort alleges a breach of a duty that the contract itself imposes, then the claim is barred; the plaintiff can sue only for contract-based remedies. *See Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 52, 70 P.3d 1 (noting that "failure to properly perform a duty assigned by the contract is a breach of that contract and nothing more"); *see also id.* ¶ 43 ("[O]nce there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract.

All contract duties, and all breaches of those duties—no matter how intentional—must be enforced under contract law.").

¶72    However, if the tort claim alleges a breach of a duty that is separate and distinct from any contractual duty existing between the parties, then the claim is unaffected by the economic loss rule; the plaintiff can proceed with that separate, non-contract claim. *See Gables*, 2018 UT 04, ¶ 48 ("If we find that an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." (quotation simplified)).

¶73    In applying the economic loss rule, our supreme court has occasionally suggested, in dicta, that intentional torts—and fraud claims specifically—fall categorically outside the ambit of the rule. *See SME Indus. Inc.*, 2001 UT 54, ¶ 32 n.8, (suggesting that "plaintiffs may recover purely economic losses in cases involving *intentional torts such as fraud*, business disparagement, and intentional interference with contract" (emphasis added)); *Davencourt*, 2009 UT 65, ¶ 38 (stating that, "despite the recovery of what would otherwise be considered economic loss damages, claims arising under a fiduciary duty, *similar to fraud claims*, lie outside the scope of the economic loss rule" (emphasis added)). Pharmacy relies on these broad assertions in support of its position that its fraud-based claims are not barred by the economic loss rule. However, we consider Pharmacy's reliance on these statements misplaced.

¶74    As an initial matter, the footnote in *SME Industries* was written prior to *Hermansen*, in which our supreme court adopted the "independent duty" formulation of the economic loss rule. *See Hermansen*, 2002 UT 52, ¶¶ 16–17. Indeed, our supreme court has itself disavowed its *SME Industries* footnote for that precise reason. *See Grynberg*, 2003 UT 8, ¶ 49 (stating that, because *SME Industries* was decided "before we adopted" the independent duty formulation, "we do not find [the *SME Industries* footnote to be] persuasive authority"); *see also HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1197, 1199 (D. Utah

2016) (Parrish, J.) (stating that the Utah Supreme Court, in *Grynberg*, "specifically addressed" the *SME Industries* footnote and "repudiated" it). And we also conclude that Pharmacy places more weight upon the supreme court's passing statement in *Davencourt* than it is able to bear. We view that statement as simply indicating that fraud-based claims *can* lie outside the scope of the economic loss rule, as long as they are grounded in an independent, non-contractual duty that is separate from the duties agreed upon in the parties' operative contract. This reading is consistent with not only other Utah Supreme Court cases, but also with decisions from federal courts applying Utah law and with case law from other jurisdictions.[15]

¶75    For instance, in *Grynberg*, the Utah Supreme Court was asked to consider whether various tort claims fell within the economic loss rule. In that case, Questar (and/or its predecessor-in-interest) entered into contracts with a supplier of natural gas, whereunder Questar agreed to purchase natural gas at a price to be "determined by a formula with three variables: price, volume, and gross heating value." *See Grynberg*, 2003 UT 8, ¶ 4. The supplier sued Questar, alleging that "by mismeasuring and wrongly analyzing the heating content of the gas," Questar breached the terms of the contract. *Id.* ¶ 46 (quotation simplified). In addition to claims for breach of contract, the

---

15. The Utah legislature has codified the economic loss rule, at least as applied to design defect and construction cases. *See* Utah Code Ann. § 78B-4-513 (LexisNexis 2012). That statute states that "nothing in this section precludes" a plaintiff in a design defect or construction case "from bringing . . . another cause of action . . . based on an intentional or willful breach of a duty existing in law." *Id.* § 78B-4-513(5). To the extent that this statutory subsection could be construed as a broad exception to the economic loss rule for intentional torts, *see HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1198 n.1 (D. Utah 2016), that exception would not apply here, because this case does not involve claims for design or construction defect.

supplier also brought fraud-based claims, including negligent or intentional misrepresentation and fraud. *Id.* ¶ 13. However, the fraud-based claims "also allege[d] mismeasurement and/or wrongful analysis of the heating content, the same conduct that is asserted in the contract claim." *Id.* ¶ 46. Accordingly, our supreme court held that all of the supplier's tort claims were barred by the economic loss rule, because "[t]he fact that the exact same conduct is described in both the contract and tort claims, and the exact same facts and circumstances are at play, is indicative of the overlapping duties in this case." *Id.* ¶ 53.[16]

¶76    This same approach has consistently been followed by federal courts applying Utah law: those courts have examined fraud claims and other intentional torts through the "independent duty" lens, and have held that tort claims—even intentional tort claims such as fraud—are barred by the economic loss rule if those claims are grounded in the same duties that exist by virtue of the parties' contract. *See, e.g.*, *HealthBanc*, 208 F. Supp. 3d at 1197, 1199–1200 (dismissing a claim for constructive fraud pursuant to the economic loss rule, because the constructive fraud claim was seeking "a tort remedy for breaches of duties imposed by" contract, and because there was no independent duty); *Anapoell v. American Express Bus. Fin.*

---

16. The *Grynberg* court applied Wyoming law, not Utah law. *See Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 40, 70 P.3d 1. However, the court interpreted Wyoming law to be governed by the same "independent duty" principles that govern Utah law in this area. *Id.* ¶ 43 (citing *Snyder v. Lovercheck*, 992 P.2d 1079, 1087–88 (Wyo. 1999), and stating that "the underlying premise of the economic loss doctrine" is "identification of the underlying duties governing the parties' relationship"). As discussed, the court also took pains to specifically disavow its own footnote from *SME Industries* regarding intentional torts. *Id.* ¶ 49. Even if not strictly binding, we consider the court's opinion in *Grynberg* to be very useful guidance regarding our supreme court's view of the economic loss rule under Utah law.

*Corp.*, No. 2:07-CV-198, 2007 WL 4270548, \*6–7 (D. Utah Nov. 30, 2007) (citing *Grynberg* and stating that the economic loss rule "applies to claims for intentional, as well as non-intentional, torts," and dismissing the plaintiff's tort claims under the economic loss rule because they were "part and parcel of the rights set forth in the" contract, and therefore were not based on any "duty independent of the" contract); *Associated Diving & Marine Contractors, LC v. Granite Constr. Co.*, No. 2:01-CV-330, 2003 WL 25424908, \*6–7 (D. Utah July 11, 2003) (dismissing some of the plaintiff's tort claims because those claims did not "allege anything different" than was alleged in the breach of contract claim, and stating that "[h]ow [the defendant] went about breaching that [contractual] duty, whether by negligence, inadvertence, misunderstanding, concealment, or misrepresentation is not legally supportive of a separate legal duty sounding in tort," but allowing a claim for fraud in the inducement to proceed, because that claim included allegations that the defendant "committed a tort before the contract was ever entered into" by allegedly misrepresenting "facts before the" contract was awarded).[17]

¶77 Under these legal principles, to determine whether the economic loss rule bars the fraud-based claims that Pharmacy has brought in this case, we must focus on whether those claims

---

17. Persuasive authority from other jurisdictions is in accord. *See, e.g.*, *United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 409 F. Supp. 2d 1083, 1093 (W.D. Wis. 2006) (holding that there is a "narrow exception" to the economic loss rule for fraud-based claims when such claims are "extraneous to, rather than interwoven with, the contract"); *Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 1995) (holding that fraud-based claims that are "undergirded by factual allegations identical to those supporting their breach of contract [claims]" are barred by the economic loss rule, but that fraud-based claims that are "extraneous to the contract" are not (quotation simplified)).

allege breaches of duties that are extraneous to the parties' contract, or whether those claims allege simply that contractual duties were breached through misrepresentation or fraud. Such an inquiry requires us to carefully examine the specific claims Pharmacy makes in support of its fraud-based claims.

¶78 Pharmacy's tort claims all contain similar allegations: that Nursing Home "represented to [Pharmacy] that [it] had the ability to comply and perform in accordance with the terms" of the parties' contract, that it "would comply and perform in accordance with the terms" of the parties' contract, and that those representations were false because Nursing Home never intended to honor the contract and instead was simply using its contractual negotiations with Pharmacy to leverage a better deal with its existing provider.[18] It is evident, however, that these allegations amount to nothing more than an assertion that Nursing Home promised that it could and would comply with the terms of the parties' contract, and that it broke those promises. These are quintessential breach of contract allegations, and they do not materially differ from the allegations Pharmacy makes to support its claim for breach of contract.

¶79 Notably, Pharmacy does not allege that Nursing Home made any other false representations—other than that it would comply with the terms of the contract—that were specifically intended to induce Pharmacy to enter into the contract. *See*

---

18. The allegations undergirding Pharmacy's claims for fraud in the inducement, intentional misrepresentation, and negligent misrepresentation are nearly identical. The allegations undergirding its claim for constructive fraud are phrased a bit differently, but the differences are ultimately immaterial. As part of that claim, Pharmacy alleges that Nursing Home had a duty to disclose to Pharmacy that it "would not terminate [its] apparent contract" with its existing provider, and that Nursing Home "had no intention of complying and performing in accordance with the terms" of the parties' contract.

*Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995) (dismissing plaintiff's fraud in the inducement claim because "plaintiff's allegations of fraud are not extraneous to the contractual dispute").[19] This case is therefore materially indistinguishable from *Grynberg*, where our supreme court concluded that "[t]he fact that the exact same conduct is described in both the contract and tort claims, and the exact same facts and circumstances are at play, is indicative of the overlapping duties in this case." 2003 UT 8, ¶ 53. In *Grynberg*, the supreme court affirmed a trial court's dismissal of a plaintiff's tort claims under the economic loss rule under such circumstances, and we are compelled to do the same in this case.

C

¶80   Pharmacy's final argument is that the trial court erred in determining that it was not entitled to any prejudgment interest,

---

19. If a plaintiff alleges that the defendant induced it to enter into a contract by making misrepresentations regarding facts not incorporated into the contract, then the plaintiff's fraud in the inducement claim would not be barred by the economic loss rule. To give one hypothetical example, if Pharmacy had informed Nursing Home that the contract only made financial sense for Pharmacy if Nursing Home had over 200 patients, and Nursing Home falsely represented that it did, and Pharmacy then entered into a "requirements" contract in reliance on that representation, Pharmacy's claim for fraud in the inducement would not be barred by the economic loss rule, because the representation in question was made prior to entering into the contract, and was a representation that went beyond simply promising to deliver the contractual goods. Here, the only misrepresentation to which Pharmacy can point is that Nursing Home promised to honor the contract and then failed to do so. Under these circumstances, Pharmacy's tort claims simply do not stem from an "independent duty" separate from the duties imposed by the parties' contract.

regardless of the rate. We conclude that the trial court's decision was correct.

¶81    Under Utah law, courts "award prejudgment interest in cases where damages are complete and can be measured by fixed rules of evidence and known standards of value." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 17, 82 P.3d 1064 (quotation simplified). In contrast, courts will not award prejudgment interest in cases where the trier of fact has to use its "best judgment in assessing the amount to be allowed for past as well as for future injury." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 100, 372 P.3d 629 (quotation simplified). The question presented here is whether Pharmacy's damages award for lost profits is the sort of damage that "can be measured by fixed rules of evidence and known standards of value," or whether it is the sort of damage that can only be assessed by using nebulous "best judgment" criteria.

¶82    Our supreme court has stated that, "[a]lthough not per se excluded, we are generally reluctant to award prejudgment interest for unrealized profits." *Id.* (quotation simplified). This is because such losses "do not represent an actual, ascertainable loss"; rather, they are a representation of the factfinder's "best approximation of that loss." *Id.* (quotation simplified). As a result, "the very nature of lost future profits injects an air of uncertainty and speculation into the calculation of damages." *Id.* (quotation simplified). Therefore, "evidence that is sufficient to permit a jury to consider whether to award damages for lost profits may still be insufficient to justify an award of prejudgment interest." *Id.* ¶ 102.

¶83    For example, in *USA Power*, our supreme court held that prejudgment interest on an award of lost profits was inappropriate in a case where a jury found that the defendant misappropriated a trade secret and breached a confidentiality and non-disclosure agreement, *id.* ¶ 26, because the plaintiff business's project "was not an established business with a long-term history of profits, there was no contract specifying the amount of profit [the plaintiff] would have gotten if [the

defendant] had not breached, and it is uncertain whether [the plaintiff] would have actually obtained" the additional contracts upon which the damages computation was based, *id.* ¶ 101.

¶84    By contrast, however, our supreme court has recognized that prejudgment interest is sometimes appropriate on an award of lost profits, if the lost profits calculation is based on "known, calculable figures" and is shown to be non-speculative. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 60, 210 P.3d 263. In that case, the plaintiff was seeking "recovery of damages for a completed percentage of work on a fixed-price contract and for profits on that work at a rate of 10%." *Id.* The defendant argued that prejudgment interest was not appropriate in that case, in part because the plaintiff was seeking recovery of lost profits. *Id.* ¶ 59. The supreme court was unpersuaded, on the facts of that case, concluding that "the profits [the plaintiff] seeks are known, calculable figures and are not similar to the speculative future profits that were at issue" in the cases cited by the defendant. *Id.* ¶ 60. Moreover, the supreme court noted that, "the [trial] court was not left to its best judgment to ascertain damages," but instead "the court reviewed the terms of [the plaintiff's] fixed price contract, the percentage of work [it] completed, and noted that the parties agreed that 10% profit on that work was reasonable." *Id.* ¶ 65. The supreme court affirmed the trial court's conclusion that prejudgment interest was appropriate in that case. *Id*. ¶ 69.

¶85    This case has much more in common with *USA Power* than it does with *Encon*. In this case, as in *USA Power*, the plaintiff (here, Pharmacy) was not an established business with a long-term history of profits, and there was no contract specifying the amount of profit Pharmacy would have received in the event Nursing Home breached the contract. *See USA Power*, 2016 UT 20, ¶ 101. Also, neither Katschke nor Damages Expert offered a damages analysis grounded in "mathematical accuracy," *id.* ¶ 100; both made a number of assumptions that called into question the firmness of their respective calculations. In the end, the jury came up with a figure that neither witness had

discussed and that neither side's attorney advocated for at closing. Under these circumstances, this case falls within *USA Power*'s general rule that prejudgment interest should not be awarded "for unrealized profits" because "damages in [such] cases do not represent an actual, ascertainable loss" but instead "represent the fact-finder's best approximation of that loss." *Id.* (quotation simplified).

¶86   Accordingly, the trial court correctly determined not to award prejudgment interest on Pharmacy's lost profits.

CONCLUSION

¶87   With regard to Nursing Home's appeal, we conclude that the trial court had the discretion to determine whether inconsistencies existed in the jury's answers on the special verdict form and, as long as the jury remained empaneled, had the discretion to ask the jury to re-deliberate regarding any inconsistencies. The trial court properly asked the jury to reconsider its potentially inconsistent answers regarding mutual mistake, breach, and damages, but the trial court abused its discretion in allowing the jury to re-deliberate regarding the amount of damages.

¶88   With regard to Pharmacy's cross-appeal, we conclude that the trial court acted within its discretion in excluding the testimony of Pharmacy Expert. We further conclude that the trial court should not have dismissed Pharmacy's fraud-based claims based on the election of remedies doctrine, but nonetheless properly dismissed those claims under the economic loss rule. Finally, we conclude that the trial court correctly determined not to award prejudgment interest on Pharmacy's damages award.

¶89   We therefore affirm in part and reverse in part the trial court's orders, vacate the trial court's judgment, and remand the case to the trial court for the limited purpose of entering judgment in favor of Pharmacy on its breach of contract claim in an amount consistent with the jury's original damages award

($143,989 in lost profits, and $0 in consequential damages), but without attorney fees.

————————